**Jim LENDALL, Plaintiff,**

v.

**George O. JERNIGAN, Jr., Individually and as Secretary of State of the State of Arkansas, Defendant.**

**No. LR–76–C–309.**

United States District Court,
E. D. Arkansas, W. D.

Jan. 5, 1977.

Jim Lendall, pro se.

Jim Guy Tucker, Atty. Gen., Lonnie A. Powers, Deputy Atty. Gen., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This is the third in a series of attacks by the plaintiff upon the laws of the State of Arkansas establishing a filing deadline and petition requirements for persons seeking to run as independent candidates in general elections.

The first suit was filed on October 7, 1974. It challenged the law, in effect at that time, which required the filing of a pledge and also of petitions (signed by not less than *15* percent of the qualified electors of the subdivision involved) within the same period of time allowed for the filing and qualification of candidates for party nominations. By reference the statute required that such filings be between the second Tuesday in March and the first Tuesday in April before the preferential primary. The three-judge district court held the law (as then written) to be "unconstitutional as ap-

plied to independent candidates for State, district, county and township offices . . . ." See *Lendall v. Bryant*, 387 F.Supp. 397 (1974).

By Act 700 of 1975, the Arkansas legislature amended the provisions of § 3–105(c) by reducing the percentage of petitioners required to "not less than ten percent of the qualified electors in the county, township or district in which such person is seeking office, but in no event shall more than 2,000 signatures be required for a district office." In statewide races the percentage was also reduced to "ten percent, or 10,000 signatures of qualified electors, whichever is the lesser." Except for the reduction in the number of petitioners, § 3–105(c) was left unchanged.

On June 15, 1976, the plaintiff filed the second suit, LR–76–C–184, challenging the *filing deadline* for independent candidates which, by reference, is fixed by the statute as "12 o'clock noon on the first Tuesday in April before the preferential primary election." § 3–113(a). As indicated above, that date is also the deadline by which persons might seek to qualify as candidates of political parties in primary elections. In his second suit, plaintiff deliberately refrained from attacking the new petition requirements of the 1975 Act.

The three-judge court in the second case concluded that the filing deadline for independent candidates for district offices, as set forth in § 3–113, Ark.Stats., was unconstitutional, generally for the same reasons that were cited as the bases of the Court's decision in *Lendall v. Bryant, supra.* The Court concluded its per curiam memorandum opinion with the following statement:

"It is the view of the Court that the General Assembly may wish, in the light of this Court's and other courts' decisions, to reexamine the filing deadlines not only for independent candidates but perhaps also for those who wish to be candidates of political parties. In any event, the Court is here holding only that the presently established filing deadline for independent candidates for district office is unconstitutional. However, we do not wish to indicate by our opinion that we believe the petition requirements enacted by the General Assembly in 1975 would withstand a constitutional attack. See *Lendall v. Bryant, supra.*"

On September 13, 1976, the plaintiff filed this proceeding challenging the *ten percent petition requirement* established by Act 700 of the Acts of 1975. In his complaint he alleges that he submitted petitions containing approximately 250 signatures, but that the defendant certified only 119 of those signatures and further advised him that a total of 874 such signatures would be required for state Senatorial District No. 3 in Pulaski County, Arkansas.

In all three proceedings, Mr. Lendall, who is not an attorney, has represented himself.

The plaintiff complains that:

". . . [T]he ten percent petition requirement for independent candidates is discriminatory, excessively burdensome, serves no compelling state interest, and is violative of independent candidates and their supporters' exercise of their right to vote and the clear right of access to the ballot. The percentage infringes upon the U.S. Constitution's First Amendment right of assembly and speech and violates the due process and equal protection guarantees made applicable to the states through the Fourteenth Amendment."

Plaintiff seeks a declaration that the provision is unconstitutional.

Very few of the facts are in dispute, although the parties argue that different inferences should be drawn therefrom. The parties stipulated that the plaintiff, Mr. Jim Lendall, meets the eligibility requirements of the Arkansas Constitution for election to the Arkansas Senate. It was further stipulated that a total of 8,531 persons voted for governor in state Senatorial District No. 3 in Pulaski County, Arkansas, at the general election held in November, 1974, and that, therefore, 853 petitioners' signatures would be required to meet the ten percent provision of § 3–105(c). In this connection, it should be pointed out that the provision in the statute stating, "but in no event shall more than 2,000 signatures be required for

a district," in no way helps petitioner because the ten percent would be considerably less than the 2,000 figure. (Note: there are other "districts"—for offices other than that of state Senate—in which the 2,000 limit might be of advantage to the independent candidate.) It was further agreed that the 853 signatures had to be gathered, according to the statute, within 60 days prior to the filing deadline (the first Tuesday in April).

According to the plaintiff's testimony, he gathered some 250 signatures in a seven-day period. The Secretary of State determined that only 119 of those signatures were valid.

Plaintiff's Exhibit 1 shows that only one independent candidate qualified for national, state or district office for the November 2, 1976, general election, and that one was for the office of Prosecuting Attorney in Pulaski County. Further, the exhibit demonstrates that Arkansas, below the state level, is still a one-party state. Over 90 percent of the candidates for district office were in fact unopposed in the general election.

The background of these three proceedings was explained in *Lendall v. Bryant, supra,* as follows:

"Candidates who run for public office in general elections in Arkansas fall into three categories: (1) The nominees of recognized political parties who, if opposed for party nomination, must run in party primaries in order to obtain nomination. (2) Qualified independent candidates whose names appear on the printed general election ballots along with the names of party nominees. (3) Write-in candidates whose names must be written on the ballots by the voters or by persons authorized by law to assist illiterate or handicapped voters.

"Candidates for State and district offices, including seats in the Legislature, are required to file political practice pledges with the Secretary of State, and candidates for party nominations are generally required to file party loyalty pledges with party officials.

"Recognized political parties in Arkansas are required to conduct primary elections for nominations for offices with respect to which two or more persons seek nomination. Two primaries may be required; the first is known as the preferential primary, and the second is known as the general primary. If there are more than two candidates for a single office, and if none of them receives a majority of votes cast in the preferential primary, the two receiving the highest number of votes must run against each other in the general primary.

"The preferential primary is held two weeks before the general primary, and the date for the general primary is now fixed by law as the second Tuesday in June of each even numbered year. Persons seeking to run in a primary must qualify by filing the necessary pledges and paying the necessary fees between the second Tuesday in March and the first Tuesday in April before the preferential primary. Section 3–113(a), (c) and (d)."

387 F.Supp. at 399–400.

After analyzing the situation, the three-judge court stated:

"We recognize at the outset of discussion that any State imposed restrictions on the right of qualified electors to cast their ballots for the candidates of their choice and to run for office are constitutionally suspect and can be upheld only to the extent that they are necessary to promote a compelling State interest. *Dunn v. Blumstein,* 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Kramer v. Union Free School District,* 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; *Williams v. Rhodes,* 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24.

"But, we must also recognize that the State has a valid and compelling interest in the fairness, efficiency, and orderly operation of its election machinery, and in the integrity of the electoral process on which democratic government depends. Subject to the constitutional limitation above mentioned, a State may regulate

and to some extent restrict the access of independent candidates to the ballot to prevent such things as unreasonable ballot congestion, voter confusion, and fraudulent or frivolous candidacies. However, the measures adopted by the State must not go beyond what the State's compelling interests actually require, and broad and stringent requirements or restrictions with respect to would-be independent candidates cannot stand where more moderate ones would do as well. *American Party of Texas v. White,* 1974, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744; *Storer v. Brown,* [415 U.S. 724, 94 S.Ct. 1274, 31 L.Ed.2d 714] *supra* ; *Rosario v. Rockefeller,* 1973, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1; *Dunn v. Blumstein,* 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Bullock v. Carter,* 1972, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; *Jenness v. Fortson,* 1971, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554.

"A requirement that an independent candidate qualify for general election ballot position during the same period allowed for qualifying by those desiring to run in party primaries is not necessarily unconstitutional and can be upheld if the qualifying deadline is not too far in advance of the general election and where the independent has a reasonable period within which to obtain signatures to his nominating petitions. *Jenness v. Fortson, supra; cf. Storer v. Brown, supra.*

"The deadline provision must be read in connection with the 15 percent requirement, and when the two are read together we are persuaded that section 3–105(c) cannot stand as far as State, district, county, and township offices are concerned.

"Whether the Arkansas Legislature so intended or not, the two parts of the requirement here challenged reinforce each other in interdicting independent candidacies for other than municipal offices, and in our view the interdiction is overbroad and excessively restricts the access of independent to the ballot. We think that the legitimate interests of the State can be served adequately by sub-

stantially less than section 3–105(c) requires.

\* \* \* \* \* \*

"Moreover. apart from the fact that the 15 percent requirement is coupled with the filing deadline that has been discussed, we are of the opinion that the 15 percent requirement itself is unreasonably oppressive and restrictive."

387 F.Supp. at 401–02.

Adopting the strategy of attacking in separate lawsuits the filing deadline and the petitioner requirement, the plaintiff has forced the Court to examine those requirements separately. At the time of the three-judge court decision in the second proceeding, we concluded that in no event could the April deadline be justified for independent candidates. We did not state or indicate that the General Assembly could not choose a common filing date for independent candidates and for those seeking nomination as the candidates of political parties. However, it would follow from our opinion that, if the legislature desired to retain the current April filing deadline for those seeking nomination as candidates of political parties, it would have to establish a separate deadline for independent candidates not so remote from the date of the general election in November. The Court mentions this here because, as indicated in the first decision, *Lendall v. Bryant, supra,* the filing deadline and the petition requirements must in the first instance be read together. If, as read together, the requirement under consideration meets minimum constitutional standards, then it must be upheld. In the second case, we concluded, in effect, that the early filing deadline could not be upheld regardless of the existence of, or the terms of, any petitioner percentage requirement. Now we are called to make a similar analysis with respect to the ten percent petitioner requirement established by the legislature in 1975.

In *Lendall v. Bryant, supra,* we stated:

"Admittedly, Arkansas has the right to keep its ballots clear of spurious or frivolous candidates, and in that connection to

require one who would run as an independent to demonstrate by nominating petitions that he has at least some substantial public support for his candidacy. *American Party of Texas v. White, Storer v. Brown, Bullock v. Carter,* and *Jenness v. Fortson,* all *supra.* And the Supreme Court has approved, albeit with some questions, State requirements of petitions signed by as many as five percent of the qualified electors who would be affected by a particular independent candidacy. *Storer v. Brown* and *Jenness v. Fortson,* both *supra.* But there is nothing in those opinions or in others that have been called to our attention that would suggest that the Supreme Court today would approve a percentage requirement as high as that of Arkansas."

387 F.Supp. at 402–03.

Must the Arkansas ten percent requirement be struck down as violative of federal constitutional standards? In view of the differing positions and differing emphases evidenced in the opinions of the Justices of the Supreme Court, the question must be considered close. First, there is the slightly differing terminology used in stating the appropriate constitutional standard. For instance, in *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 31 L.Ed.2d 714 (1973), Justice White states:

"In challenging § 6830(d) (Supp.1974), appellants rely on *Williams v. Rhodes* and assert that under that case and subsequent cases dealing with exclusionary voting and candidate qualifications [cases cited] substantial burdens on the right to vote or to associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest. These cases, however, do not necessarily condemn § 6830(d) (Supp.1974). It has never been suggested that the *Williams-Kramer-Dunn* rule automatically invalidates every substantial restriction on the right to vote or to associate. Nor could this be the case under our Constitution where the States are given the initial task of determining the qualifications of voters who will elect members of Congress. Art. I, § 2, cl. 1. Also Art. I, § 4, cl. 1, authorizes the States to prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives.' Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.

"It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating these restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree,' *Dunn v. Blumstein,* supra at 348, very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' *Williams v. Rhodes, supra,* 395 U.S. at 30, 89 S.Ct. 1886; *Dunn v. Blumstein, supra,* 393 U.S. at 335, 92 S.Ct. 995. What the result of this process will be in any specific case may be very difficult to predict with great assurance."

415 U.S. at 729–30, 94 S.Ct. at 1278–79. Justice Brennan, on the other hand, states the test:

"The Court's opinion in these cases, and that in *American Party of Texas v.*

*White, post*, 415 U.S. p. 767, 94 S.Ct. 1296, 39 L.Ed. 744, hold—correctly in my view—that the test of the validity of state legislation regulating candidate access to the ballot is whether we can conclude that the legislation, strictly scrutinized, is necessary to further compelling state interests. See *ante*, [1282] at 736; *American Party of Texas v. White, post*, at 780–781, 94 S.Ct. 1296; for, as we recognized in *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), such state laws 'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' The right to vote derives from the right of association that is at the core of the First Amendment, protected from state infringement by the Fourteenth Amendment. *NAACP v. Button*, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963); *Bates v. Little Rock*, 361 U.S. 516, 522–523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 460–461, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Indeed the right to vote is 'a fundamental political right, because preservative of all rights,' *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220, 270 (1886), and '[o]ther rights, even the most basic are illusory if the right to vote is undermined,' *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). See also *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). Thus, when, legislation burdens such a fundamental constitutional right, it is not enough that the legislative means rationally promote legitimate governmental ends. Rather,

" 'governmental action may withstand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest. *Shapiro v. Thompson*, 394 U.S. [618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600

(1969)]; *United States v. Jackson*, 390 U.S. 570, 582–583, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138 (1968); *Sherbert v. Verner*, 374 U.S. 398, 406–409, 83 S.Ct. 1790, 1795, 1797, 10 L.Ed.2d 1065 (1963). And once it be determined that a burden has been placed upon a constitutional right, the onus of demonstrating that no less intrusive means will adequately protect compelling state interests is upon the party seeking to justify the burden. See *Speiser v. Randall*, 357 U.S. 513, 525–526, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958).' *Oregon v. Mitchell*, 400 U.S. 112, 238, 91 S.Ct. 260, 321, 27 L.Ed.2d 272 (1970) (separate opinion of Brennan, White, and Marshall, JJ.)."

*Storer v. Brown, supra* (Brennan, J., dissenting), at 755–57, 94 S.Ct., at 1291–1292.

In *Storer*, under the California statute independent candidates had to obtain petitions signed by voters not less in number than five percent of the total votes cast in California at the last general election, but the law also severely restricted the "pool" of eligible petitioners and also the time frame within which the petitions had to be obtained. Justice White commented:

"This percentage, as such, does not appear to be excessive, see *Jenness v. Fortson, supra*, but to assess realistically whether the law imposes excessively burdensome requirements upon independent candidates it is necessary to know other critical facts which do not appear from the evidentiary record in this case."

*Storer v. Brown, supra*, at 738, 94 S.Ct. at 1283.

Justice White went on to note that it was not unlikely that the available pool of petitioners would be substantially smaller than the total vote in the last general election, thus requiring petitioners to obtain substantially more than five percent of the total eligible pool. He commented:

"This would be in excess, percentagewise, of anything the Court has approved to date as a precondition to an independent's securing a place on the ballot and in excess of the 5% which we said in *Jenness*

was higher than the requirement imposed by most state election codes."

*Storer v. Brown, supra,* at 739, 94 S.Ct. at 1283.

Justice Brennan dissented in *Storer* since he felt that there was no need to remand the case, the pertinent information concerning the size of the available pool being a matter of record or judicial notice. He stated:

"I also dissent from the Court's remand, in the case of appellants Hall and Tyner, of the question concerning the constitutionality of the petition requirements imposed upon independent candidates.

\*      \*      \*      \*      \*      \*

"A remand in the case of Hall and Tyner, however, is unnecessary because the data upon which relevant findings must be based are already available to us. The data are cited by the Court, *ante,* at 742 n. 12 and at 744 n. 14. Evaluated in light of our decision in *Jenness v. Fortson, supra,* the data leave no room for doubt that California's statutory requirements are unconstitutionally burdensome as applied to Hall and Tyner. Official voting statistics published by the California Secretary of State indicate that 6,633,400 persons voted in the 1970 general election. See Secretary of State, Statement of Vote, General Election, November 7, 1972, p. 6. Appellants were required to secure signatures totaling 5% of that number, *i. e.,* 331,670. The statistics also indicate the size of the total pool from which appellants were permitted to gather signatures. The total number of registered voters on September 14, 1972—the last day appellants were permitted to file nomination petitions—was 9,953,124. See Secretary of State, Report of Registration, September 1972, p. 8. Of that number, 6,460,220 registered voters could not sign petitions because they had voted in the 1972 primary elections. See Secretary of State, Statement of Vote, Consolidated Primary Election, June 6, 1972, pp. 3, 4–23. Thus, the total pool of registered voters available to appellants was reduced to approximately 3,492,904, of

which the required 331,670 signatures was *9.5%.*

"In my view a percentage requirement even approaching the range of 9.5% serves no compelling state interest which cannot be served as well by less drastic means."

*Storer v. Brown, supra,* at 762–64, 94 S.Ct. at 1294–95.

Both Justice White and Justice Brennan considered the percentage requirement in connection with the 24-day period provided for obtaining the signatures. Justice White suggested that if the percentage requirement were to approach ten percent, it might nevertheless be upheld if the severe time limitations were relaxed or eliminated. Note his language:

"If the required signatures approach 10% of the eligible pool of voters, is it necessary to serve the State's compelling interest in a manageable ballot to require that the task of signature gathering be crowded into 24 days?"

*Storer v. Brown, supra,* at 743, 94 S.Ct. at 1285.

And Justice Brennan in his dissent commented:

"The 5% requirement, in reality, forced them to secure the signatures of 9.5% of the voters permitted by law to sign nomination petitions. Moreover, unlike Georgia's six-month period for gathering signatures, the California election laws required appellants to meet that State's higher percentage requirement in only 24 days. Thus, even conceding the substantiality of its aims, the State has completely failed to demonstrate why means less drastic than its high percentage requirement and short circulation period—such as the statutory scheme enacted in Georgia—will not achieve its interests."

*Storer v. Brown, supra,* at 765–66, 94 S.Ct. at 1296.

While the above analysis indicates the closeness of the question, the Court concludes that its resolution must finally depend upon the answer to the "inevitable question" posed by Justice White:

". . . [I]n the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not."

*Storer v. Brown, supra,* at 742, 94 S.Ct. at 1285.

On the basis of the evidence in the record, the Court finds that a reasonably diligent independent candidate, especially a poor person, could not reasonably be expected to satisfy the ten percent petition requirement of the Arkansas law. It therefore concludes that under no circumstances could that high a percentage requirement meet constitutional muster.

The defendant argues that had the plaintiff been able to collect 17 signatures per day (his average for the seven-day period), he would have been able to collect a total of 1,030 valid signatures within the 60-day period, thus proving that the statute did not require the impossible. Defendant contends that plaintiff has failed to satisfy his burden of proof. But note again that in situations where fundamental constitutional rights are burdened by legislation, that legislation may withstand constitutional scrutiny "only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." *Oregon v. Mitchell,* 400 U.S. 112, 238, 91 S.Ct. 260, 321, 27 L.Ed.2d 272 (1970). The "onus of demonstrating that no less intensive means will adequately protect compelling state interest is upon the party seeking to justify the burden." *Oregon v. Mitchell, supra.*

It is clear that the plaintiff is an extraordinarily energetic person. He is a laboring man who, although he might take off most of a week to seek petition signatures, could not possibly take off 60 or even 30 days from his work for such purpose. The plaintiff has satisfied the Court that it is extremely difficult to obtain signatures with respect to anything that smacks of political action. His "production" during the seven-day period was indeed remarkable. But the overall picture is such that the Court is convinced that reasonably diligent independent candidates could not be expected to satisfy the ten percent signature requirement within the 60-day period allowed. Nor is that high a percentage necessary to protect any compelling state interest.

As pointed out in *Lendall v. Bryant, supra,* the qualifying requirement in Arkansas for independent candidates for municipal office is much less rigorous than that imposed upon such candidates for state and district offices. An independent candidate for municipal office may have his name placed on the ballot if he obtains petitions signed by not less than ten nor more than 50 qualified electors of the city or ward with respect to which he desires to run. See § 3–105(c). Moreover, the law permits him to file his petition not later than 45 days before the general election. See § 3–105.1, Act 42 of 1972. When one compares the population of the city of Little Rock with state Senatorial District No. 3, it is obvious that the former has many more electors than the latter. But fewer signatures are required to qualify for the municipal ballot position than are required for an independent seeking to qualify as a candidate for Senatorial District No. 3. Traditionally, municipal elections have been nonpartisan in the sense that all candidates usually run as "independents". The legislation here under scrutiny reflects, arguably, a greater concern to protect candidates nominated in party primaries from opposition in the general election than to protect one "independent" from another. This is not the type of concern that can be equated with the state's possible interest in avoiding voter confusion by limiting ballot access to those demonstrating significant voter support.

Before 1955, an independent candidate could qualify by obtaining not less than 50 nor more than 1,000 signatures for any state, district or county office, and not less

than ten nor more than 50 for any township or ward office. And, prior to the adoption of Act 465 of 1969, an independent could qualify down to 60 days before the general election. Act 352 of 1955, § 2; § 3–837, Ark.Stats.Ann.

The State has not brought forth any evidence which would support its argument that the ten percent petition requirement is necessary to vindicate any of the state interests properly asserted. That requirement for state senatorial districts is, therefore, declared to be unconstitutional.

Once again, as in *Lendall v. Bryant, supra,* the Court does not deem it appropriate to dictate to the General Assembly the extent to which the section should be amended if it is to meet minimum constitutional standards.

No injunction will issue. If the next General Assembly does not act, or if the Secretary of State undertakes to enforce the statute as it is now written, it may be necessary to enjoin him from so doing. But, as stated in *Lendall v. Bryant,* that can be done within the framework of another suit.

Judgment will be entered accordingly.