**William Pennell ROCK, Plaintiff,**

v.

**Winston BYRANT, Individually and as Secretary of State of the State of Arkansas, Defendant.**

**No. LR–C–78–170.**

United States District Court,
E. D. Arkansas, W. D.

July 19, 1978.

William Pennell Rock, pro se.

John M. Fincher, Asst. Atty. Gen., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

Plaintiff, an independent candidate for the office of United States Senator, chal-

lenges as unconstitutional that portion of Ark.Stat.Ann. § 3–105(c) (Supp.1977) which establishes the deadline for the filing of nominating petitions by independent candidates seeking statewide office. This action is before the court on plaintiff's complaint and upon his motion for a temporary restraining order, preliminary injunction and declaratory relief seeking suspension of further enforcement of the statute until this matter is determined. Plaintiff has additionally asked that this cause be treated as a class action.

Section 3–105(c)[1] requires an independent candidate seeking either a state public office or the office of United States Senator to file nominating petitions no later than noon on the Monday immediately preceding the date of the preferential primary.[2] Petitions may only be circulated in a sixty-day period prior to the filing deadline and must contain signatures totaling either 3% of the qualified electors, or numbering 10,000, whichever is less. The number of qualified electors is determined by the total number of votes cast for all candidates in the preceding general election for governor. Only registered voters can be qualified electors.

Besides contending that the filing deadline is too far in advance of the date of the general election and that the sixty-day period in which to circulate petitions is too restrictive, plaintiff alleges that this statute deprives him of equal treatment before the law since it imposes a burden on independent candidates from which party nominees are relieved since the latter are not required to qualify for ballot positions until 45 days prior to the general election. The statute to which plaintiff refers is Ark.Stat. Ann. § 3–113(j)(1 & 2) (Repl.1976)[3] which

1. (c) Any person desiring to have his name placed upon the ballot as an independent candidate without political party affiliation for any state, county, township or district office, shall in any general election in this State file as an independent candidate in the manner provided herein, not later than twelve (12:00) noon on the Monday immediately preceding the Preferential Primary Election, and shall furnish at the time he files as an independent candidate petitions signed by not less than three (3%) of the qualified electors in the county, township or district in which such person is seeking office, but in no event shall more than 2,000 signatures be required for a district office; or if such person is a candidate for State office or for United States Senator in which a Statewide race is required, such person shall file petitions signed by not less than three percent (3%) of the qualified electors of the State, or 10,000 signatures of qualified electors whichever is the lesser, each of whom shall be a registered voter and such petitions shall be directed to the official with whom such person is required by law to file nomination certificates to qualify as a candidate, requesting that the name of such person be placed on the ballot for election to the office mentioned in the petition. Such petitions shall be circulated not earlier than sixty (60) calendar days prior to the deadline for filing such petitions to qualify as an independent candidate. In determining the number of qualified electors in any county, township, district or in the State, the total number of votes cast therein for all candidates in the preceding general election for the office of Governor shall be conclusive of the number of qualified electors therein for the purposes hereof. The

sufficiency of any petition filed under the provisions hereof may be challenged in the same manner as provided by law for the challenging of Initiative and Referendum petitions. Independent candidates for municipal office may qualify by petition of not less than ten (10) nor more than fifty (50) electors of the ward or city in which the election is to be held. A person who has been defeated in a party primary shall not be permitted to file as an independent candidate in the general election for the office for which he was defeated in the party primary.

2. The general primary election is held on the second Tuesday in June preceding the general election. The preferential primary election is held on the Tuesday two weeks prior to the general primary election. Ark.Stat.Ann. § 3–113(c), (d). The general election is held on the Tuesday following the first Monday in November. Ark.Stat.Ann. § 3–602 (Repl.1976).

In the current year, 1978, the date of the preferential primary was May 30; the deadline for filing nominating petitions by independent candidates was May 29; the date of the general primary was June 13; the general election will be held on November 7. The filing deadline falls 162 days in advance of this year's general election.

3. (j)(1) The Secretary of State shall, at least sixty (60) days prior to the date of the General Election, notify by registered mail the Chairman and Secretary of the State Committee of the respective political parties that a certification of nomination is due for all duly nominated candidates for United States, State and District offices in order that the candidate's name be

provides that candidates for state public office nominated by their respective political parties are notified by the Office of the Secretary of State at least 60 days prior to the date of the general election to file a certificate of nomination before their names can be placed on the ballot. These certificates must be filed at least 45 days, but not more than 55 days prior to the general election.

Defendant is a party to this litigation individually and in his capacity as Secretary of State. Ark.Stat.Ann. § 3–121 (Repl. 1976) requires that nominating petitions and certificates of nomination be filed in that office. Defendant has filed a motion to dismiss alleging the complaint fails to state a claim upon which relief can be granted and that the court does not have jurisdiction of the subject matter.

A motion to intervene on behalf of plaintiff and supporting brief has been filed by Jim Lendall, alleging his right to do so because he has, in the past, been a candidate for public office as an independent candidate. Lendall is not presently a candidate for public office in any capacity but states that should he attempt to file as an independent candidate under the present law, the mechanics of filing a separate suit would cause him undue hardship.

The jurisdiction of this court has been properly invoked by plaintiff pursuant to 28 U.S.C.A. § 1331; a complaint alleging the discriminatory application of a presumptively valid state statute clearly raises a substantial federal question. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Plaintiff's failure to separately state the jurisdictional basis on which this action is predicated is not fatal to his cause of action since federal court jurisdiction appears clearly and distinctly on the face of the complaint. *Cf., Koll v. Wayzata State Bank*, 397 F.2d 124 (8th Cir. 1968). As to defendant's allegation that the complaint fails to state an actionable claim, ". . . the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

Plaintiff has alleged facts indicating he is a serious candidate for public office. Since the deadline for filing nominating petitions has passed, unless this court enjoins further enforcement of the statute, the injury plaintiff will suffer is that his candidacy will be foreclosed.[4] Plaintiff has accordingly demonstrated the necessary personal interest in the outcome of this action to establish his standing to sue, and this court

placed on the ballot of the General Election. The State Committee shall issue said certificates of nomination to all duly nominated candidates for United States, State and District offices, who shall file said certificates with the Secretary of State at least forty-five (45) days but not more than fifty-five (55) days prior to the General Election. However, if the Chairman and Secretary of the State Committee of the respective political parties are not properly notified as directed by this Section, the failure of a candidate to file a certificate of nomination shall not prevent that candidate's name from being placed on the ballot of the General Election.

(2) Each County Clerk shall, at least sixty (60) days prior to the date of the General Election, notify by registered mail the Chairman and Secretary of the County Committee of the respective political parties that a certified list of all duly nominated candidates for county, township and municipal offices is due and shall be filed with the County Board of Election Commissioners and the County Clerk in order

that the candidates' names be placed on the ballot for the General Election. The County Committee shall issue said certified list on behalf of those duly nominated candidates and submit the certified list to the County Board of Election Commissioners and the County Clerk at least forty-five (45) days but not more than fifty-five (55) days prior to the General Election. However, if the Chairman and Secretary of the County Committee of the respective political parties are not properly notified as directed by this Section, the failure of a certified list to be filed shall not prevent any candidate's name from being placed on the ballot of the General Election.

4. Plaintiff's cause of action is not moot even though the filing deadline is passed. The issues have been properly presented and will continue to affect Arkansas politics as the challenged statute is applied in future elections. The controversy is "capable of repetition, yet evading review." *Dunn v. Blumstein*, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998, 31 L.Ed.2d 274 (1972).

has been requested to adjudicate the rights of a litigant to an actual controversy. *Baker v. Carr, supra.* However, the court must deny plaintiff's motion to bring this suit as a class action since he has failed to satisfy the requirements set forth in Rule 23, Fed. R.Civ.P.

█ As to Lendall, who has sought permission to intervene, his motion is denied since he is not now a candidate for statewide public office, and he has failed to satisfy the requirements of Rule 24 Fed.R. Civ.P. and Local Rule 8 of this court. In *Solien v. Miscellaneous Drivers & Helpers Union, Local No. 610,* 440 F.2d 124 (8th Cir. 1971), the court held that since the applicant could not maintain this action himself, he should not be allowed to intervene as a party. Nevertheless, the court has treated the brief filed by Mr. Jim Lendall as a brief *amicus curiae* and considered its contents the same as if he were permitted to intervene in this action.

After due notice to the parties, the matter was set for hearing on the merits June 14, 1978. The plaintiff's sworn testimony at the hearing brought forth several pertinent facts. Plaintiff did not decide to run for the United States Senate until on or about May 1, 1978 and he obtained the necessary petition forms from the Secretary of State's office on that date. By plaintiff's own estimation, he secured approximately 60 signatures [5] between May 1 and May 15. On May 15th plaintiff called a press conference to publicly announce his intention to run for the senate as an independent candidate. From the date of his press conference until May 29, 1978, the filing deadline for independent candidates, plaintiff secured an additional 800 signatures. Thus, as of the filing deadline, plaintiff had secured approximately 860 signatures of the necessary 10,000. Subsequent to the filing deadline, plaintiff asserts that he has obtained an additional 1,100 signatures for a total of 2,000 or roughly one-fifth of the requisite number prescribed by Section 3–105(c).[6]

After plaintiff's testimony two witnesses were called on behalf of defendant. Bill Bethea, employee in the Secretary of State's office in charge of elections, testified that seven applications had been received from independent candidates [7] seeking various public offices throughout the state, one of which had been for the United States Senate. That application, submitted

---

**5.** The number of signatures cited herein are the numbers given by plaintiff under oath on June 14, 1978. Plaintiff neither produced nor offered as an exhibit any of the signatures he states that he obtained.

**6.** It is the function of the Secretary of State to examine the petitions and certify that the requisite number of signatures has been filed and that they are of qualified electors.

**7.** The testimony indicated applications have been made for the following offices, the number of signatures required and the number submitted on the nominating petitions:

Local legislative offices:

| | | |
|---|---|---|
| (1) District 69 | Jim Hinshaw | 200 required, 243 submitted |
| (2) District 62 | George Pugh | 163 required, 200 submitted |
| (3) District 84 | Lillian Douglas | 424 required, 800 submitted |
| (4) District 5 | Hank Kessler | 500 required, 926 submitted |
| (5) District 20 | Doug Haynie | 188 required, 266 submitted |

Circuit Judge:

District 16 – No name was supplied by witness Bethea, but his testimony was that 824 signatures were required and 1,525 were submitted.

Ark.Stat.Ann. § 3–105(c), *supra,* n. 1 provides that independent candidates seeking political offices other than in a statewide race must file nominating petitions containing signatures numbering 3% of the qualified electors of the political subdivision in which the office is sought, or 2,000 signatures, whichever is less. The filing deadline is the same as for those running in a statewide race, *i. e.,* noon on the Monday immediately preceding the preferential primary. *See also* § 3–113(j)(2), *supra,* n. 3.

by John Black, contained 16,574 signatures, 10,097 of which had been determined to be valid.[8] Introduced through witness Bethea was Defendant's Exhibit No. 2, the notarized formal certificate evidencing that 726,949 votes were cast in the previous governor's race on November 2, 1976. Bethea stated that the total number of signatures required to be filed by an independent candidate in the current race for United States Senator was 10,000 since that was the lesser figure as opposed to 3% of the total votes cast in the preceding governor's race.

Defendant's second witness was John Black, the independent candidate for United States Senator, whose petitions were on file in the Secretary of State's office. He stated that he began his candidacy by purchasing a full page advertisement in the Arkansas Gazette on April 12, 1978. The purpose of this ad was to let people know he was a serious candidate for the office. Black testified he had secured the great majority of the approximately 16,000 signatures on his petitions through personal contact. It was also his testimony that he collected the requisite number of signatures in less than 60 days.

The right of state legislatures to prescribe and regulate the times, places and manner of holding elections [9] has been recognized on numerous occasions by the United States Supreme Court. *Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). This broad power enjoyed by the states, however, is subject to constitutional limitations and must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment. *Bullock v. Carter, supra.* Whenever a state statute is challenged as violative of this constitutional provision, courts, in scrutinizing its validity, must consider three factors: (1) the facts and circumstances behind the law, (2) the interests claimed to be protected and furthered by the states and (3) the interests of those who maintain they are disadvantaged by the statute. *See, e. g., Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

More recently the Supreme Court has had occasion to consider ballot access restrictions imposed on independent candidates by various statutory schemes enacted by the states as part of an attempt to regulate the electoral process. *See, Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); and *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). Emerging from these decisions is a judicial test that attempts to strike a constitutional balance by measuring the overall burden imposed by these comprehensive electoral systems on the protected interests of the independent candidates as well as on the interests sought to be served by the states. *See, Developments—Election Law,* 88 Harv.L.Rev. 1111, 1142 (1975).

In the earliest of these decisions, the Supreme Court determined the constitutional validity of the suspect statutory schemes in terms of the respective interests sought to be protected. In *Williams v. Rhodes, supra,* the Court rejected most of the interests advanced by the state as compelling and focused primarily on two different but overlapping rights these statutory restrictions on ballot access had been recognized to burden—". . . the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Id. 393 U.S. at 30, 89 S.Ct. at 10.

---

8. After ascertaining that a sufficient number of valid signatures were contained on the petitions filed, no further counting was done by the office of the Secretary of State.

9. U.S.Const. art. I, § 2, cl. 1 gives to the states the duty of determining the qualifications of voters who will elect members to Congress, and art. I, § 4, cl. 1 permits the states to determine election procedures for United States Senators and Representatives.

Strict access requirements imposed on qualifying procedures for ballot position, however, can be upheld as not impermissibly burdensome if it can be determined that they are necessary to further some compelling state interest. The state has an interest in avoiding confusion, deception and frustration at the polls, and one way of advancing this interest is to require some preliminary showing of a "significant modicum of support" before permitting the name of an independent candidate to be placed on the ballot. *Jenness v. Fortson, supra*; *American Party of Texas v. White, supra.*

In *Storer v. Brown, supra*, the following was stated with regard to other variables which must be considered where qualifications for candidates are at issue:

> The Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot. *Jenness v. Fortson*, 403 U.S., at 442, 91 S.Ct. at 1976; *Williams v. Rhodes*, 393 U.S., at 32, 89 S.Ct. 5, at 11. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. Id. 415 U.S. at 732, 94 S.Ct. at 1280. [Quoting from *Bullock v. Carter*, 405 U.S., at 145, 92 S.Ct. 849.]

Achieving a manageable ballot is another state interest and this can be accomplished by requiring the signature solicitation period to end at a reasonable time prior to the general election so that nominating papers can be verified. *Storer v. Brown, supra.*

Later Supreme Court decisions articulated a more comprehensive albeit not conclusive approach through which to evaluate the burden the regulatory schemes impose on potential independent candidates. The burden can be translated into figures or statistics representing the total number of signatures required on the petitions and the total pool from which they can be obtained. The Court in *Storer v. Brown, supra*, determined that once this was done, there remained one final question for judgment:

> . . . in the context of California [or any state] politics, could a *reasonably diligent* independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not. Id. 415 U.S. at 742, 94 S.Ct. at 1285. [emphasis added]

The importance of past experiences of other candidates was further emphasized as a significant indicator in *American Party of Texas v. White, supra.*

In the most recent case, *Mandel v. Bradley, supra*, the Supreme Court in remanding the case for further proceedings, set forth four directives the lower court had failed to follow when it initially passed on the statutory procedure before it: (1) make further findings with respect to the extent of the burden imposed on independent candidates; (2) make findings of fact as to the difficulty of obtaining signatures in time to meet the early filing date; (3) consider the extent to which other features of the statutory electoral scheme moderated whatever burden the deadline creates, *e. g.*, the limitations on the period during which signatures may be collected, the nature of the pool out of which the signatures may come; and (4) analyze what the past experiences of other independent candidates for statewide office might indicate about the burden imposed on those seeking slots on the ballot.

The Arkansas Statute under consideration, § 3–105(c) has been challenged as being unconstitutional on three previous occasions. As a result of *Lendall v. Bryant*, 387 F.Supp. 397 (E.D.Ark.1975) the percentage of qualified electors required to sign the nominating petitions was changed from 15% to 10%. *See* Acts of Arkansas, Act 700 of 1975. The second lawsuit, *Lendall v. Jernigan*, LR–76–C–184 (E.D.Ark.1976) challenged the filing deadline for independent

candidates which, at that time, was "12 o'clock noon on the first Tuesday in April before the preferential primary election." The court held that portion, as read together with the 10% requirement, was unconstitutional. In *Lendall v. Jernigan*, 424 F.Supp. 951 (E.D.Ark.1977), the 10% signature requirement was invalidated. The present statute requires the number of signatures to be not less than 3% of the qualified electors that voted in the last governor's election or 10,000 signatures of qualified electors, whichever is less, and that the nominating petitions be filed by noon on the Monday preceding the preferential primary. Acts of Arkansas, Act 731 of 1977.

Although variations exist among the statutory procedures employed by the several states, the present Arkansas Statute appears markedly more similar to those which have been upheld as constitutionally valid. For example, in *Jenness v. Fortson, supra*, the Supreme Court considered the constitutionality of a Georgia statute which required an independent candidate to file nominating petitions signed by 5% of the number of registered voters at the last general election for the office sought. The potential nominee was given 180 days to circulate his petitions and the deadline for filing them was the second Wednesday in June, the same deadline that a candidate filing in a party primary had to meet. In upholding the validity of the Georgia statute, the Court distinguished it from an Ohio statute which in *Williams v. Rhodes, supra*, it had held imposed too great a burden on the independent candidate. The Ohio statute required petitions reflecting signatures of 15% of the voters who voted in the last governor's election be filed in February before the general election. Although the Court in *Jenness* noted that the 5% petition requirement was somewhat higher than what was required by most state codes,[10] it looked to the entire Georgia statutory scheme and found that the 5% requirement was balanced by the fact that Georgia im-

posed no restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wished. The Court further found that the June filing deadline was not unreasonably early as had been the case with the February deadline established in the Ohio statute considered in the *Williams* case.

More recently the Supreme Court, in *Mandel v. Bradley, supra*, considered a Maryland statute which a three-judge panel had invalidated and which required nominating petitions for independent candidates to contain signatures of at least 3% of that state's registered voters. The petitions were required to be filed 70 days before the party primaries in order to secure a ballot position for the general election. This deadline was 120 days before the general election in non-presidential election years and 230 to 240 days prior to the general election in presidential election years. [This statute is distinguishable from the Arkansas statute since it placed no limitation on the time period for signature gathering and the petitions had to be filed 70 days prior to the primary election.] In remanding the case for further proceedings, the Court distinguished *Tucker v. Salera*, 399 F.Supp. 1258, aff'd 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), which the three-judge panel had principally relied upon. In *Tucker v. Salera, supra*, the Court had summarily affirmed as unconstitutional a Pennsylvania statute which required nominating petitions containing signatures of 2% of the largest vote cast for any candidate in a preceding statewide general election be gathered within a 21-day period and filed 244 days before the date of the general election. The fatal flaw in the Pennsylvania statute was the combination of an early filing date and the 21-day limitation on the period for signature solicitation.

To critically and realistically assess the present Arkansas statute, in light of the constitutional standards set forth by the

10. 403 U.S., at 442 n. 28, 91 S.Ct. 1970, more particularly referring to *Williams v. Rhodes, supra*, 393 U.S., at 47 n. 10, 89 S.Ct. 5. (Harlan, J., *concurring in result*) which included a categorical breakdown of the states and the number of signatures required as a percentage of the electorate.

Supreme Court, this court must look to all the facts developed at the hearing as well as to the total electoral statutory scheme which has been promulgated by the state to regulate its electoral process.

■ The Arkansas statute limits the time period for soliciting signatures to the 60 days prior to the filing deadline, and the greatest number of signatures that can possibly be required is 10,000. This requirement, standing alone, is not an unreasonable or onerous burden, and is prima facie valid. *Cf. Storer v. Brown, supra* (where the Supreme Court held that a California statute which required 325,000 signatures to be gathered in 24 days did not impose an impossible burden and was facially valid). This finding is further buttressed by the fact that there are virtually no restrictions levied on the pool out of which these signatures may come. Only qualified electors may sign the petitions, and this group is defined in the statute to include all registered voters. A total number of signatures based on 3% of the votes cast in the last Governor's race comes into play only when that percentage is less than 10,000. The evidence at the hearing was that a total of 726,949 votes were cast in the 1976 Arkansas general election for governor. Three percent of that figure is 21,808.47, while the lesser number of signatures required, 10,-000, represents only 1.375% of the total vote in the 1976 governor's race.

The court's analysis of the past experiences of other independent candidates is extremely limited. Only one independent candidate for statewide office has sought to qualify under the present statute. John Black testified that he initiated his campaign and signature solicitation drive on April 12, 1978, and on May 29, the filing deadline, submitted petitions containing in excess of 16,000 signatures.

When the Arkansas procedural restriction which calls for solicitation of the alternative number of signatures is read together with the sixty-day limitation on the time period allotted for gathering the signatures, this state's statute clearly satisfies constitutional standards. From all the evidence produced at the hearing, it is not unreasonable for this court to conclude that in the context of Arkansas politics, a "reasonably diligent" candidate can be expected to satisfy the filing requirements with some regularity. Plaintiff has not satisfactorily established that the procedural prerequisites contained in the Arkansas statute place on him a burden so great that independent candidates are effectively precluded, without variation, from gaining ballot positions for the general election. *Cf., MacBride v. Exon,* 558 F.2d 443 (8th Cir. 1977) (found to be the effect of a February filing date).

At the hearing, plaintiff stressed the importance of the timing involved in making the decision to run for public office, asserting that he needed additional time to secure the required number of signatures because until he decided to run on May 1, the political issues involved in the race for United States Senator were not fully developed. Plaintiff, however, stated that the difficulty he faced was not in securing the requisite number of signatures in the period of time so allotted, but in persuading people to sign his petitions because they were already committed to a candidate.

Plaintiff has contended that as an independent candidate, the filing deadline is too far in advance of the general election, and further emphasizes that § 3–105(c) requires an independent candidate to file petitions no later than the day before the preferential primary; in contrast it is alleged that party nominees are not required to qualify under § 3–113(j) until 45 days before the date of the general election.[11]

---

**11.** Plaintiff has placed great reliance on the court's ruling in *Lendall v. Jerningan,* LR–C–76–184, *supra,* in which it was ordered that Lendall be given until noon on August 31, 1976 to file nominating petitions. In his post-hearing brief, plaintiff has asserted that he would not be "aggrieved" if this court grants to him the same extension of time. The court recognizes that the filing deadline set in § 3–105(c) prior to the 1977 Amendments was invalidated, but that special circumstances existed in that case which prompted the court's extension of the deadline. In the order entered in *Lendall v. Jernigan, supra,* it was stated:

In passing on plaintiff's narrow allegation, the court re-emphasizes that the state has a legitimate interest in setting a date certain on which nominating petitions must be filed. The basis for furthering this state interest springs not only from administrative necessity but also from the state's duty to see to it that a reasonably diligent independent candidate who has labored to satisfy statutory prerequisites is not precluded from securing a ballot position in the general election. Sufficient time must be set aside after filing to verify the signatures that appear on the petitions as well as to resolve any disputes that may have arisen and to review contested petitions. *See Ashworth v. Fortson*, 424 F.Supp. 1178 (N.D.Ga. 1976).

Furthermore, in order to avoid or at best minimize confusion and frustration at the polls, voters should not be confronted with a "laundry list" of candidates which includes the names of frivolous political office seekers. Voters should only be required to exercise the most important right they have, the right to vote,[12] when they can choose from a slate of candidates who will strive to conscientiously perform the duties of the office they seek. "The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not." *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). Theoretically,

a serious candidate will be a *reasonably diligent candidate* who will be able to establish a "modicum of support" for his candidacy by satisfying the statutory nominating procedures.

. . . It is not without reason to require a candidate to announce his desire to seek public office well in advance of the general election. A man who is genuinely concerned with the needs and wants of the constituency he hopes to represent, who seeks public office not out of a desire to aggrandize himself, but to contribute to the well-being of his followers, ought to be familiar with the election laws regulating his candidacy, and ought to be willing to give the public a sufficient time to study and analyze the tenets of his political philosophy. . . . *Pratt v. Begley*, 352 F.Supp. 328, 330 (E.D.Ky. 1970), aff'd 409 U.S. 943, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972) (The statute upheld required all candidates to file nominating petitions no later than March 31, 1970, which was 55 days before the primary elections and seven months in advance of the general election.)

The Arkansas election machinery, in practical operation, does not work to require plaintiff, in essence, to solicit signatures and thereby evidence support for his candidacy in a political vacuum or at a time when the campaign issues have not yet crystalized. Under Ark.Stat.Ann. § 3–113(a) (Supp.1977)[13] candidates who are

Mr. Jim Lendall *has been diligent in attempting to qualify* as an independent candidate for State Senate in District 3 and in pursuing his legal remedies in an effort to challenge the law with respect to the filing deadline for independent candidates for such positions. [Mr. Lendall filed the complaint June 15, 1976.] Through no fault of his own, the Court has only been able to reach the issues this date. [August 20, 1976]

The Court is of the view, under all the circumstances, that Mr. Lendall is entitled to injunctive relief requiring the defendant to accept the petition filings of the plaintiff, Mr. Lendall, which are tendered by the plaintiff on or before 12 o'clock noon on August 31, 1976. *However, our decision in this respect should not be deemed as requiring the General Assembly of the State of Arkansas to establish a deadline so near the general election*

or, indeed, to establish any particular deadline. It is clear that the Legislature has certain discretion with respect to such matters, and that that discretion should not be interfered with so long as it is exercised within constitutionally acceptable limits. [emphasis added]

12. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

13. 3–113. Schedule of dates applicable to primary elections.—(a) Party pledges, if any, and political practice pledges for primary elections shall be filed, and ballot fees shall be paid

seeking political office through party affiliation and nomination must complete their filing procedures between noon on the second Tuesday in March and noon on the first Tuesday in April. This time period is relatively near the date when independent candidates may permissibly begin their activities for gathering signatures for their nominating petitions since the allotted time commences sixty days prior to the filing deadline. Section 3–105(c), *supra.* In all probability, campaigning for office has already begun by this time and will continue at an increasingly vigorous pace as the date of the preferential primary draws near. The bare allegation that political issues have not been formulated by the date of the filing deadline for independent candidates is inconclusive in view of the fact that the preferential primary is held the following day. It is therefore not unreasonable to require independent candidates seriously seeking statewide office to have concluded their qualifying procedures by this time. As a result of the preferential primary, voters as well as independent candidates are fully aware of the names of the party nominees which will appear on the general election ballot unless a general primary is triggered by a run-off in the preferential

primary. In any event, the identities of the party opponents are made certain by the date of the general primary which is held approximately two weeks later. Section 3–113(c), (d), *supra.* The statute to which plaintiff refers in his allegation, Sec. 3–113(j) [14] merely serves the administrative purpose of verifying for the Secretary of State's office after the primaries have been held the names of the parties' respective nominees who will be candidates in the general election.

This court cannot realistically be called on to set aside the present filing deadline and thereby leave to the legislature the impossible task of ascertaining at what point in a political race the issues have become crystalized and then set the filing deadline accordingly. Carried to a logical extreme, it is conceivable that different deadlines could be required for each public office. No political race, statewide or otherwise, is identical, and at what point the issues become identified and formulated, even if capable of ascertainment, depends on several variables, including the nature of the office sought and the political personalities of the aspirants. The observation that the candidates themselves formulate the issues by bringing them to the focus of public

---

during regular office hours not earlier than twelve o'clock (12:00) noon on the second Tuesday of March, and not later than twelve o'clock (12:00) noon of the first Tuesday of April, before the preferential primary election. Party pledges, if any, and political practice pledges shall be filed, and ballot fees for special primary elections shall be paid on or before the deadline established by proclamation of the Governor. Provided, pledges and ballot fees for a new Political Party shall be filed and paid as provided in subsection (1) of Section 13 of Article 1 of Act 465 of 1969, as amended [§ 3 -113(1)].

*See also* § 3-109 (Supp.1977):

\* \* \* \* \* \*

(b) Before the name of any person shall appear on the primary ballot of a political party as a candidate for any local, State or Federal office, the Secretary of the County Committee or the Secretary of the State Committee, as the case may be, of the political party must make an affirmative determination that the person complies with the eligibility requirements of the office. The Secretary of the County Committee or State Committee, as the case may be, shall require an affidavit of eligibility from the candi-

date, and the Secretary may make such independent investigation as he deems necessary to determine the eligibility of the candidate to serve in the office he seeks, including the power to compel the person to answer interrogatories. Such affidavit of eligibility shall be filed along with the filing fee and party pledge, and the investigation concerning the eligibility shall be concluded within two [2] weeks after the filing deadline for nomination.

\* \* \* \* \* \*

Any candidate who shall fail to file the party pledge and pay the ballot fee at the time and in the manner as provided in this Section shall not have his name printed on the ballot at any primary election.

The names of candidates who file with the State Committee as provided in this section shall be certified to the various county committees in the manner and at the time provided in subsection (b) of Section 13 [subsection (b) of this section] of this Article. [Acts 1969, No. 465, Art. 1, § 9, p. 1195; 1977, No. 169, § 1, p. ——.]

**14.** See footnote 3, *supra.*

attention and reaction is just as true as the converse, *i. e.*, that the issues formulated as the campaign progresses can act as determining factors in reaching the decision to seek public office. The fact that election issues can immediately rise to the forefront of a heated political campaign and then become moot almost instantaneously indicates their nebulous nature and their potential for dissipation.

In the instant case, the sixty-day period for signature solicitation began to run on April 1. Plaintiff testified that he did not initiate his campaign as an independent candidate for United States Senator until May 1, approximately thirty days after which he could have begun gathering signatures. Since the court has previously found that a "reasonably diligent" candidate can successfully meet the statutory qualifying procedures within the time and by the method prescribed, plaintiff has not established that his candidacy has been precluded because of any arbitrary filing deadline rather than because of his dilatory entrance into the Senate race. "Rules may differ widely from state to state, but all may reflect a state's 'compelling interest' in setting up a structured system, even though no one format can be said to be the only possible one." *LaRouche v. Guzzi*, 417 F.Supp. 444, 448 (D.Mass.1976). Plaintiff has not proved to the satisfaction of the court that moving the filing deadline more nearly within the time frame of the general election would as efficaciously advance state interests as the present statutory scheme.

For the reasons set forth in this memorandum opinion, plaintiff's complaint is dismissed and the Clerk is directed to enter an Order accordingly.[15]

---

15. Although plaintiff asked that a three-judge court be convened to hear this cause of action, this is no longer required (28 U.S.C.A. §§ 2281, 2282 Repealed Pub.L. 94-381 §§ 1, 2 Aug. 12, 1976) since this court has determined the plaintiff's action herein does not fall within the purview of 28 U.S.C.A. § 2284.