The AMERICAN PARTY et al., Plaintiffs,

v.

George O. JERNIGAN, Jr., as Secretary of State of the State of Arkansas, Defendant.

No. LR–76–C–277.

United States District Court, E. D. Arkansas, W. D.

Jan. 7, 1977.

Art Givens, Givens & Buzbee, Little Rock, Ark., for plaintiffs.

Jim Guy Tucker, Atty. Gen., Lewis D. Smith, Deputy Atty. Gen., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, Chief Judge.

The complaint herein was filed on August 23, 1976. It challenges the constitutionality of sections 3–101(a) and 3–113(*1*), Ark. Stats.1974 Ann., which relate to the petition requirements and filing deadlines for establishing new "political parties" in Arkansas. The prayer in the complaint seeks a declaration that said provisions are unconstitutional. It also sought a permanent injunction restricting the enforcement of said statutes and an order requiring the defendant to place the Presidential and Vice-Presidential candidates of the American Party on the ballot for the 1976 general election.

A hearing was held on September 15, 1976, upon the application for injunctive relief. For the reasons stated at the conclusion of said hearing, such relief was denied.

A hearing on the merits was scheduled for and held on October 11, 1976. The issues were briefed, and the matter was taken under advisement on November 10, 1976.

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law with respect to the declaratory relief prayed in the complaint.

The Court finds that the American Party and the American Party of Arkansas have been active in this state since at least 1968. Indeed, in 1968 Governor Wallace was the candidate of the American Party. His name appeared on the ballot in the general election that year resulting in his polling 235,627 votes as compared to 189,062 for the Republican candidate and 184,901 for the Democratic candidate. At its Arkansas convention in 1968, the plaintiff Parties had over 400 delegates in attendance from 57 of the 75 counties in the state.

In the general election of 1970 plaintiffs' candidate for Governor was on the ballot and polled 5.9 percent of the total vote cast for that office. A few months thereafter, in 1971, the General Assembly of the State of Arkansas enacted the seven percent petitioner requirement, which will be discussed below.

In 1972, another presidential election year, a great effort was made to meet the seven percent petition requirement. At

that time it was assumed that the filing deadline was in late May. By that assumed filing deadline, plaintiffs were short approximately 10,000 signatures. The Secretary of State, however, stated that he was granting a 30-day extension of the deadline. During the extension period the plaintiffs were able to bring the total number of signatures to approximately 43,000, which was about a thousand more than required. However, a lawsuit was filed challenging the new party and its right to place its candidates on the ballot for the general election. The state court concluded that the petitions had not been filed within the time required by law and that the Secretary of State had no authority to extend the deadline. This defeat had a stifling effect upon the plaintiffs' efforts in subsequent years to obtain petitions.

In 1974 the American Party held a state convention and also sought petitions to qualify as a new political party. They obtained approximately three percent, not the seven percent required. Those seeking signatures found a strong reluctance on the part of qualified voters to get involved in politics "so early", and they also found a fear on the part of such prospects that they might be involved in litigation if they signed such petitions.

In 1976 the plaintiffs again held a state convention and elected delegates who attended the national convention held thereafter in Salt Lake City, Utah. At that convention Mr. Tom Anderson was nominated for the office of President and Mr. Rufus Shackleford for the office of Vice-President. In 1976 the plaintiffs again sought to obtain the necessary number of signatures to qualify as a new party and, again, they fell short, obtaining only approximately three percent instead of the required seven percent.

The Court finds the facts as stated in the stipulation which was received in evidence at the trial on October 11, 1976, as Joint Exhibit 1. If one considers the number of votes cast for the offices of Governor or for President of the United States in the Arkansas general elections held in 1968, 1970, 1972, and 1974, the seven percent requirement would result in figures ranging from 38,218 to 45,364, the average appearing to be about 42,000. Other findings of fact will be stated elsewhere in this Memorandum Opinion.

■ Although the Arkansas law makes provisions for independent candidates who seek to run for state, district, county or municipal offices, there is no provision for independent candidates to run for the positions of President or Vice-President of the United States in our general elections. Although no attack is made upon this omission in the lawsuit, the absence of such a provision must be considered in evaluating the requirements for the establishment of new political parties. The latter route is the only one available for those not affiliated with existing "political parties" to obtain access to the ballot. In this connection it should be pointed out that statutory provisions permitting the establishment of new parties are not necessarily an adequate substitute for provisions permitting the qualification of independent candidates. As was stated in *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1973), at 745–46, 94 S.Ct. at 1286:

" . . . But the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other. A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office. From the standpoint of a potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his own independent status, even though his possible interest in the new party centers around a particular candidate for a particular office. For the candidate himself, it would mean undertaking the serious responsibilities of qualified party status under California law, such as the conduct of a primary, holding party conventions, and

the promulgation of party platforms. But more fundamentally, the candidate, who is by definition an independent and desires to remain one, must now consider himself a party man, surrendering his independent status. Must he necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not."

To understand the issues tendered it is necessary to review the legislative history of sections 3–101(a), 3–113(a) and 3–113(*1*). Section 1(a) of Article 1 of Act 465 of 1969 provided:

" 'Political party' shall mean any organized political party, authorized under the laws of this State, which selects and certifies candidates whose names appear on the ballot at any general or special election in this State as the nominees of said political party."

Section 13(a) of that 1969 Act provided:

"Party pledges, if any, and political practices pledges for primary elections shall be filed, and ballot fees shall be paid, not later than 12 o'clock noon on the third (3rd) Tuesday of June, before the preferential primary election. Party pledges if any, and political practices pledges shall be filed, and ballot fees for special primary elections shall be filed, on or before the deadline established by proclamation of the Governor."

The above two sections are the predecessors, respectively, of sections 3–101(a) and 3–113(a).

Two Acts were passed in the 1971 legislative session which amended the above provisions and added section 3–113(*1*). Act 261 of 1971 amended Section 1(a) of Article 1 of Act 465 of 1969 [section 3–101(a)] to read as follows:

" 'Political Party' shall mean any group of voters which, at the last preceding general election, polled for its candidate for Governor in the State or nominees for Presidential Electors at least seven (7%) percent of the entire vote cast for such office; or which filed with the Secretary of State a petition signed by qualified electors equal in number to at least seven

(7%) percent of the total vote cast for the office of Governor or nominees for Presidential Electors, at the last preceding election, declaring their intention of organizing a political party the name of which shall be stated in the declaration, and of participating in the next succeeding general election. Said petition to be filed with the Secretary of State at least thirty days prior to 12 o'clock noon on the third (3rd) Tuesday of June before any general election in which the political party filing such petitions desires to participate. No such group of electors shall assume a name or designation which is similar, in the opinion of the Secretary of State, to that of an existing political party as to confuse or mislead the voters at an election. When any political party fails to obtain seven (7%) percent of the total vote cast at an election for the office of Governor or nominees for Presidential Electors it shall cease to be a political party."

Act 261 of 1971 was approved March 10, 1971, without an emergency clause and, therefore, went into effect 90 days after the adjournment of that legislative session. Twelve days after the approval of Act 261, the legislature enacted Act 347 of 1971 which amended section 13(a) of Article 1 of Act 465 [section 3–113(a)] and which added to section 3–113 subsection (*1*). Section 3–113(a) was amended to read as follows:

"Party pledges, if any, and political practice pledges for primary election shall be filed, and ballot fees shall be paid not earlier than 12 o'clock noon on the first Tuesday of April and not later than 12 o'clock noon on the third Tuesday of April, before the preferential primary election. Party pledges, if any, and political practice pledges shall be filed, and ballot fees for special primary elections shall be filed, on or before the deadline established by proclamation of the Governor."

The new subsection, subsection 3–113(*1*), was then added. It reads as follows:

"Any group of voters desiring to file a petition with the Secretary of State

signed by qualified electors equal in number to at least seven per cent (7%) of the total vote case [sic] for the office of Governor or nominees for Presidential Electors, at the last preceding election, so as to establish a Political Party shall file said petition at least thirty days prior to the date established for the filing of party pledges, if any, and political practice pledges for primary elections. Said petition shall be filed at least five (5) days prior to any deadline established by proclamation of the Governor for the filing of party pledges, if any, and political practices pledges and ballot fees for special primary elections."

Since Act 347 of 1971 contained an emergency clause, it went into effect on the date approved, March 22, 1971.

Has the filing deadline established in section 3–101(a) ("at least thirty [30] days prior to . . . the third Tuesday of June before any general election") been repealed by section 3–113(*l*)? In answer, we note first that there was no specific repealer. But is there an implied repealer?

At one time the Court assumed that the two provisions might be interpreted so that both could stand and be given effect. In oral argument, there was the discussion that perhaps the earlier deadline established by section 3–113(*l*) might be interpreted as the deadline for any "political party" which wished to participate in the next general election and that the later deadline in section 3–101(a) might control where the petitioners wanted to establish themselves as a "political party" but were *not* interested in participating in the next general election. However, this argument is not tenable since, under section 3–101(a), the petitioners must declare their intention "of participating in the *next succeeding general election*." (Emphasis supplied.) And the petitions must be filed at least 30 days before the third Tuesday in June "before any general election *in which the political party . . . desires to participate*." (Emphasis supplied.)

Part of the confusion arises from the piecemeal amendment of the election laws.

As originally enacted, section 3–113(a) provided:

"Party pledges, if any, and political practice pledges for primary elections shall be filed . . . not later than 12 o'clock noon on the third Tuesday in June, before the preferential primary election."

That language was appropriately coordinated with the provision in section 3–101(a) as amended by Act 261 of 1971. And, as indicated above, in 1969 there was no such provision as is presently found in section 3–113(*l*). The 1971 amendment by Act 347, changed section 3–113(a) to establish the current deadlines ("between . . . the second Tuesday in March and . . . the first Tuesday in April before the preferential primary election"). That 1971 Act also added subsection (*l*) to section 3–113. Apparently, no one thought to specifically repeal the dates provided in section 3–101(a) or to amend those dates to conform to the other date changes made in section 3–113(a).

With this legislative history in mind, the Court must conclude that, although repeals by implication are not favored, the legislative intent in enacting section 3–113(*l*) necessarily implied its intent to repeal the filing deadlines established in section 3–101(a). Not only does the language of 3–101(a) indicate the necessity of the intent and desire to participate in the "next succeeding general election" but also the amendments to 3–113(a) make it impossible for a political party, qualifying as such in May, to participate in the next general election, since by May the deadlines for structuring the required party primaries have already passed.

The parties in their briefs and oral arguments indicate that section 3–101(a) contains no limitations on the time within which petitions may be obtained. The Court disagrees. Section 3–101(a) provides that the requisite number of qualified electors sign petitions "declaring their intention of organizing . . . *and of participating in the next succeeding general election*." (Emphasis supplied). It is there-

fore obvious that all such petitions would become void with the passage of the "next succeeding general election." Therefore, assuming there is no shorter time frame provided by the Arkansas statutes, or necessarily implied therefrom, there is nevertheless the time frame from the first Tuesday in November of even-numbered years ("general election" years) to the filing deadline for such petitions in the next even-numbered ("general election" year) year.

Having determined the "opening date" for obtaining signatures, it is now necessary to determine the "cutoff date" for the filing of the petitions.

Section 3–113(1) provides:

"Any group of voters desiring to file a petition with the Secretary of State signed by qualified electors equal in number to at least seven per cent (7%) of the total vote cast for the office of Governor or nominees for Presidential Electors, at the last preceding election, so as to establish a Political Party shall file said petition at least thirty [30] days prior to *the date established for the filing of party pledges, if any, and political practice pledges for primary elections.*" (Emphasis added).

This provision was added to the law in 1971. What is the "date established for filing of party pledges, if any, and political practice pledges for primary elections"? Section 3–113(a) provides:

"Party pledges, if any, and political practice pledges for primary elections shall be filed, and ballot fees shall be paid during regular established business hours between 12 o'clock noon on the second (2nd) Tuesday in March and 12 o'clock noon on the first (1st) Tuesday in April before the preferential primary election."

It will be noted that the Arkansas law does not establish a "date" for filing party pledges and political practice pledges. Rather, it establishes a bracket of time "between 12 o'clock noon . . . on the second Tuesday in March and 12 o'clock noon on the first Tuesday in April before the preferential primary election."

In 1976, the "second Tuesday in March" fell on March 9 and the "first Tuesday in April" fell on April 6.

In the light of the above, what does section 3–113(1) mean when it states that the seven percent petitions shall be filed "at least thirty [30] days prior to the date established for the filing of party pledges, if any, and political practice pledges for primary elections"? Should the Court take the first "opening" date, which in 1976 would have been March 9, or the second "cutoff" date, which in 1976 would have been April 6; or should it take any other of the "dates" within such bracket of time?

The differences are not trivial. If one accepts the "opening date", then the seven percent petitions would have to be filed "at least 30 days prior to" that date, or, in 1976, no later than Saturday, February 7. If the "cutoff date" is used, then, under section 3–113(1), said petitions would have had to be filed, in 1976, no later than Saturday, March 6. The determination of the appropriate filing deadline under section 3–113(1) would, in turn, as indicated above, establish the closing time bracket within which petition signatures could be obtained.

The general election in 1974 was held on November 5. Therefore, the time within which petitions could have been obtained would have been between November 5, 1974, and either February 7, 1976, or March 6, 1976, that is, either 15 or 16 months. If the deadline in 1976 was February 7, it would be almost nine months before the general election on November 2. If the date of the filing deadline is established as of March 6, then that would be approximately eight months before the general election.

Whether one takes the "opening" or "cutoff" dates as the deadline for filing the seven percent petitions, "30 days prior" to that date will establish a filing date earlier than that required for the filing of party pledges and political practice pledges for those desiring to participate in party primary elections (note that 30 days prior to April 6, 1976, would be March 6, whereas

the "second Tuesday in March" would be March 9).

Should the entire petition requirement be declared unconstitutional simply because it is so vague and ambiguous? In this connection, is it not clear that to establish the filing deadline for the petitions, the Court must in fact "legislate" which of several possible alternative dates is most appropriate since there are no adequate clues to the real intention of the General Assembly? The question answers itself. The Court must conclude that the petition provisions at issue are too vague and indefinite to be enforced and, further, that to judicially supply the needed definiteness would improperly involve the Court in exercising legislative prerogatives.

The writing of election laws is a complex business requiring careful consideration of the impact of each provision upon the overall plan. Once a comprehensive election plan has been enacted into law, amendments thereto aimed at particular objectives can easily lead to confusion unless a broad view of the effect of those amendments is not first taken.

The 1971 amendments to the 1969 Act appear to be of this character. The focus obviously was on the limited objectives and not upon the effect thereof upon the overall election plan; consequently, the conflicts and ambiguities to which we have referred.

Assuming the petition filing requirements need not fall because of their vagueness and ambiguity, we would then be required to resolve the confusion by the analysis made above, thereby concluding that the filing deadline would either be 30 days before the second Tuesday in March or 30 days before the first Tuesday in April in each general election year. Whether the Court adopts one or the other interpretation, the overall petition requirement would then fail to meet constitutional standards enunciated by the Supreme Court of the United States in *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1973).

Assuming signatures can be obtained beginning on a date no later than the day after the preceding general election and, therefore, assuming that signatures could then be obtained for a period of either 15 or 16 months, would such extensive periods of time render reasonable and non-onerous the seven percent requirement? The Court has heard the evidence in the case and finds that the 15 or 16 months period appears to be more reasonable than it is in fact. The evidence convinces the Court that it is always difficult to obtain citizens' signatures to anything smacking of political action. And it is almost impossible in the off year after a general election to stir up any interest in political matters which will not, by their nature, come to fruition for yet another year. This is a politically barren period which does not, as a practical matter, add much to the time available for obtaining signatures. Indeed, either of the possible filing dates would normally pass before any real political activity or interest therein could be expected.

The evidence in this case is indeed quite dramatic. The plaintiff American Party's candidate was on the ballot in the 1968 general election. That candidate, Governor Wallace, led the ticket in Arkansas in the general election. This circumstance alone indicates the broad support in this state of many of the political views of the plaintiffs. In the next general election the American Party polled approximately six percent of the votes for the office of Governor. A few months later, when the General Assembly of the State of Arkansas met, the seven percent requirement was enacted into law. The juxtaposition of these two events cannot be totally ignored.

Considering the obvious broad appeal and the past successes of the plaintiffs, it is interesting to again note that in the years 1974 and 1976 the petition efforts of the plaintiffs resulted in obtaining only between two and three percent of the qualified electors required.

Since the enactment of the seven percent requirement, no new political party has been formed in the State of Arkansas, and

it is the Court's finding and conclusion that if said requirement is maintained it is unlikely that any new political party will be formed in the future. Therefore, the situation in Arkansas is entirely different than it was in Texas as described by the Supreme Court in the *American Party of Texas v. White* case, *supra*. In Texas the percentage requirement was one percent of the total gubernatorial vote at the last preceding general election. Furthermore, there were two separate opportunities given to obtain this total which, by the way, in Texas amounted to approximately 22,000 signatures. Although the plaintiff in the *American Party of Texas* case did not obtain the necessary signatures within the time allowed by Texas law, the evidence revealed that two other parties, La Raza Unida and the Socialist Workers Party, did satisfy the petition requirements and, therefore, had their candidates placed on the general election ballot. The American Party of Texas argued that the petition requirements were impermissible burdens on the rights secured by the First and Fourteenth Amendments and also violated the equal protection clause of the Fourteenth Amendment. To this, the Court replied:

"We have concluded that these claims are without merit. We agree with the District Court that whether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations against parties not polling 2% of the last election vote, their validity depends upon whether they are necessary to further compelling state interests, *Storer v. Brown, ante,* [415 U.S.], at 729–733, [94 S.Ct. 1274 at 1278–1281]. But we also agree with the District Court that the foregoing limitations, whether considered alone or in combination, are constitutionally valid measures, reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways."

*American Party of Texas v. White, supra,* 415 U.S. at 780–81, 94 S.Ct. at 1305. With respect to the one percent requirement, the Court said:

"To obtain ballot position, the parties subject to Art. 13.45(2) (Supp.1973), as were these appellants, were also required to demonstrate support from electors equal in number to 1% of the vote for governor at the last general election. Appellants apparently question whether they must file any list of supporters where the major parties are required to file none. But we think that the State's admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support. So long as the larger parties must demonstrate major support among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner. Of course, what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot. The Constitution requires that access to the electorate be real, not 'merely theoretical.' *Jenness v. Fortson,* 403 U.S. 431, 439 [91 S.Ct. 1970, 1974, 29 L.Ed.2d 554] (1971)."

*American Party of Texas v. White, supra,* 415 U.S. at 782–83, 94 S.Ct. at 1306. The Arkansas petition requirement makes demands which are so excessive and impractical as "to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot." In further discussing the concept of a fixed percentage requirement, the Court said:

"The District Court recognized that any fixed percentage requirement is necessarily arbitrary, but we agree with it that the required measure of support— 1% of the vote for governor at the last general election and in this instance 22,-000 signatures—falls within the outer boundaries of support the State may require before according political parties ballot position. To demonstrate this degree of support does not appear either impossible or impractical,  . . . . ."

*American Party of Texas v. White, supra,*
at 783, 94 S.Ct. at 1307. I am not certain
what the Court means when the Court re-
fers to the "outer boundaries" of support
the State may require, particularly when I
note a footnote by the Court immediately
following which refers to "this lenient one
percent petition requirement." Neverthe-
less, the Court has no problem with the
seven percent requirement. It is simply
excessive and is not required to vindicate
any legitimate state interest.

■ For the reasons stated above, both
the seven percent petition requirement and
the filing date, or dates, for said petitions,
as set forth in sections 3–101(a) and
3–113(*1*), are declared unconstitutional. As
stated in the case of *Lendall v. Jernigan,*
D.C., 424 F.Supp. 951, 1977, no injunction
will issue. If the next General Assembly
does not act, or if in the future the Secre-
tary of State undertakes to enforce sections
3–101(a) or 3–113(*1*) as now written, it may
be necessary to enjoin him from so doing.
But that can be done in the context of
another lawsuit.

Judgment will be entered accordingly.