Paul DELANEY;  Mary Elizabeth
Boyd;  and Cynthia Jane
Wyatt, Plaintiffs,

v.

Gary O. BARTLETT, in his official ca-
pacity  as  Executive  Secretary–Di-
rector  of  the  North  Carolina  State
Board  of  Elections;  and  North  Car-
olina Board of Elections, Defendants.

No.  Civ.1:02 CV 00741.

United States District Court,
M.D. North Carolina.

July 26, 2004.

Kris Vincent Williams, Sylva, NC, for
Plaintiffs.

Susan Kelly Nichols, Alexander McClure Peters, Department of Justice, Raleigh, NC, for Defendants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

An unaffiliated candidate running for statewide office in North Carolina must comply with the eligibility requirements of North Carolina General Statute § 163–122(a)(1) to be placed on the general election ballot. Plaintiff Paul DeLaney and his supporters contend that this statute impermissibly infringes on the rights guaranteed by the First and Fourteenth Amendments to the United States Constitution. Pursuant to 28 U.S.C. § 2201, DeLaney seeks a declaratory judgment invalidating Section 163–122(a)(1). For the following reasons, the court finds that North Carolina General Statute § 163–122(a)(1) imposes an unconstitutional burden on the rights of unaffiliated candidates and their supporters.

### FACTS

In September 2001, DeLaney began a petition drive to have his name placed on the 2002 North Carolina General Elections Ballot. DeLaney sought to run as an unaffiliated candidate for the United States Senate. After obtaining fewer than one hundred of the 90,639 signatures required to secure a place on the ballot, DeLaney decided instead to qualify as a write-in candidate.

On September 6, 2002, approximately two months before the election and days before the absentee ballots were to be printed, DeLaney and two of his supporters filed this declaratory judgment action, claiming that North Carolina General Statute § 163–122(a)(1) unconstitutionally infringed on their First and Fourteenth Amendment rights. In their complaint, Plaintiffs asked the court to order DeLaney's name placed on the ballot as an unaffiliated candidate. The court denied Plaintiffs' request on October 18, 2002.

The parties then filed cross-motions for summary judgment, and on December 24, 2003, the court denied both parties' motions. *See Delaney v. Bartlett*, 2003 WL 23192145 (M.D.N.C. Dec. 24, 2003). The court ruled that Plaintiffs had standing to challenge the statute and that the nature of such a challenge precluded application of the mootness doctrine. *See id.* at *3–4. On March 31, 2004, the court held an evidentiary hearing at which North Carolina Board of Elections ("Board") Deputy Director Johnnie McLean ("McLean") testified.[1] The case is now ready for disposition.

### DISCUSSION

#### I. *Standard of Review*

The Declaratory Judgment Act grants federal district courts discretion to entertain requests for declaratory judgment. *See* 28 U.S.C. § 2201. The court has "great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir.1998). The court may hear a declaratory judgment action if the judgment "will serve a useful purpose in clarifying and settling the legal relations in issue [and] will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir.1994) (internal quotations omitted; citations omitted), *abrogated on other grounds by Wilton v. Seven*

---

1. McLean has nineteen years of experience with the Board and has served as Deputy Director since 1995. Her areas of expertise include voting equipment and ballot preparation for state and local elections.

*Falls Co.*, 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).[2]

## II. *Disparity Challenge*

■ DeLaney challenges the constitutionality of North Carolina General Statute § 163–122(a)(1) on two grounds. First, DeLaney takes issue with North Carolina's differing requirements for unaffiliated candidates and new party candidates who seek ballot access.[3] Specifically, DeLaney asserts that the disparity between the signature requirements for unaffiliated candidates and new party candidates places an unconstitutional burden on unaffiliated candidates. North Carolina General Statute § 163–122(a)(1) mandates that an unaffiliated candidate running for statewide office will be placed on the general election ballot only if the candidate

> file[s] written petitions with the State Board of Elections supporting his candidacy for a specified office. These petitions must be filed with the State Board of Elections on or before 12:00 noon on the last Friday in June preceding the general election and must be signed by qualified voters of the State equal in number to two percent (2%) of the total number of registered voters in the State as reflected by the most recent statisti-

cal report issued by the State Board of Elections.

N.C. Gen.Stat. § 163–122(a)(1).[4] The requisite number of signatures varies widely depending on the "most recent statistical report" used. To be placed on the 2002 general election ballot, a potential unaffiliated candidate needed to obtain signatures equal to two percent of registered voters, or 90,639 signatures. (Br. Supp. Defs.' Mot. Summ. J., Decl. Gary O. Bartlett, at ¶ 5.)

In contrast, North Carolina General Statute § 163–96(a)(2) requires a candidate seeking to form a "political party"[5] to obtain signatures of "registered and qualified voters in this State equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor." N.C. Gen.Stat. § 163–96(a)(2). The new party petitions must be signed by at least 200 voters from each of four North Carolina congressional districts and must be filed before noon on the first day of June preceding the general election.[6] *See id.*

Once the party representative files the requisite petitions, the new party is entitled to place candidates on the general election ballot. *See* N.C. Gen.Stat. § 163–

---

2. DeLaney has not expressed an intent to run for statewide office in the future. However, because Section 163–122(a)(1) applies to all unaffiliated candidates seeking to hold statewide office, the uncertainty, insecurity, and controversy giving rise to this proceeding will not be extinguished by DeLaney's candidacy decision. The court will entertain this declaratory judgment action to clarify the permissible burden on all persons considering unaffiliated candidacy in North Carolina.

3. North Carolina also allows for write-in votes. *See* N.C. Gen.Stat. § 163–123. The qualifications for a write-in candidacy are not at issue in this case.

4. Section 163–122(a)(1) also requires the candidate to present his petitions to the chairman

of the State Board of Elections for signature verification fifteen days before the petitions are due. *See* N.C. Gen.Stat. § 163–122(a)(1).

5. A political party is recognized in North Carolina if the party's representative polled at least ten percent of the vote for governor or for presidential electors in the last general election or if the party complies with the petition requirements for the formation of a new party. *See* N.C. Gen.Stat. § 163–96(a)(1)–(2).

6. North Carolina General Statute § 163–96 also requires new parties to submit their petitions fifteen days early for signature verification. *See* N.C. Gen.Stat. § 163–96(b1).

98. If the party has multiple candidates vying for office, it must hold a convention to select its nominees. *See id.* ("For the first general election following the date on which it qualifies under G.S. 163–96, a new political party shall select its candidates by party convention."). However,

> [i]f a nominee for a single office is to be selected and only one candidate of a political party files for that office ... then the appropriate board of elections shall, upon the expiration of the filing period for said office, declare such persons as the nominees or nominee of that party, and the names shall not be printed on the primary ballot, but shall be printed on the general election ballot as candidate for that political party for that office.

N.C. Gen.Stat. § 163–110. To be eligible for ballot access in 2002, a new party candidate needed to garner signatures equal to two percent of the total number of voters who voted for governor in 2000, or 58,841 signatures.[7] (Br. Supp. Pls.' Mot. Summ. J. at 15.)

Thus, in 2002, a candidate seeking statewide office as the sole representative of a "political party" would be placed on the ballot after obtaining approximately 32,000 fewer signatures than if he ran without a party affiliation. Such a candidate would not be subject to a primary election or nominating convention and would incur only *de minimis* additional burdens.[8] *See* N.C. Gen.Stat. § 163–110. Consequently, the statutory scheme discourages a candidate who wishes to be unaffiliated in favor of the formation of a political party, whatever its size or motivation.[9] *See* McLean Testimony, Mar. 31, 2004 (acknowledging that DeLaney could form the "Paul DeLaney Party" to avoid the more demanding requirements of Section 163–122).

The Board dismisses potential problems with this disparity, reasoning that both types of signature requirements have been upheld. Considered in isolation, North Carolina's two percent signature requirement for unaffiliated candidates is not constitutionally infirm. *See Jenness v. Fortson,* 403 U.S. 431, 438, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding Georgia ballot access requirement that independent candidates obtain signatures of five percent of total registered voters). Likewise, North Carolina's ballot access requirements for new parties have withstood constitutional scrutiny. *See McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1229 (4th Cir.1995) (rejecting challenge to various North Carolina elections laws regulating new parties). However, "a number of facially valid election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer v. Brown,* 415 U.S. 724, 737, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). There-

---

7. Candidates seeking ballot access through Section 163–96 will be referred to as "new party" candidates throughout this opinion.

8. A new party candidate has approximately one month less to collect his signatures and needs to obtain at least 200 signatures from each of four congressional districts. *See* N.C. Gen.Stat. § 163–96(a)(2). In addition, the candidate's petition must state the party chairman's name and address and indicate that the signers of the petition "intend to organize a new political party to participate in the next succeeding general election." N.C. Gen.Stat. § 163–96(b). The Fourth Circuit has interpreted this language to impose no requirement that petition signers actually organize or affiliate with the new party. *See McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir.1995).

9. Though it is theoretically possible that the signature requirements for both types of candidates could be equal if every registered voter voted for governor in the previous election, McLean acknowledges that such an occurrence is highly unlikely. She posits that, on average, the number of voters for governor is less than half of the total number of registered voters in the state.

fore, "a reviewing court must determine whether 'the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights.' " *McLaughlin*, 65 F.3d at 1223 (quoting *Williams v. Rhodes*, 393 U.S. 23, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)) (alterations in *McLaughlin* ). Given North Carolina's overall statutory scheme for ballot access, the focus of the court's inquiry is whether the State may permit unaffiliated candidates to conform to significantly greater requirements than new party candidates for a place on the general election ballot. *See Am. Party of Texas v. White*, 415 U.S. 767, 788, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (affirming that the First and Fourteenth Amendments and the Equal Protection Clause require "essentially equal opportunity for ballot qualification").

To resolve this question, the court examines the regulations under the test established in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Under *Anderson,* the court must weigh the character and magnitude of the injury to First and Fourteenth Amendment rights against the State interests justifying the statute's restrictions, considering the extent to which the State's interests are necessary to burden the plaintiff's rights. *See Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. If the statute's restrictions are "severe," they will be upheld only if they are narrowly drawn to advance a compelling interest. *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). If the restrictions are "reasonable" and "nondiscriminatory," the State's important regulatory interests are generally sufficient to justify the statute. *Id.*

Ballot access restrictions implicate important voting, associational, and expressive rights protected by the First and Fourteenth Amendments. *McLaughlin,* 65 F.3d at 1221. "By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, [ballot access] restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Anderson,* 460 U.S. at 794, 103 S.Ct. 1564. Unaffiliated candidates enhance the political process by challenging the *status quo* and providing a voice for voters who feel unrepresented by the prevailing political parties.[10] *See id.*

North Carolina's restrictions limit the opportunities for unaffiliated candidates to impact the State's political landscape. This is evidenced by the degree of exclusion from the ballot of unaffiliated candidates in comparison with party candidates. *See Storer,* 415 U.S. at 742, 94 S.Ct. 1274 (noting that in determining the overall burden of a ballot access requirement, "[p]ast experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not."); *Fishbeck v. Hechler,* 85 F.3d 162, 164–65 (4th Cir. 1996) (examining historical data to determine severity of burden on minor party candidates). Election data demonstrates that minor party candidates obtain a place on the North Carolina general election ballot with some regularity. *See, e.g.,* "Abstract of Votes Cast for United States Senator in the General Election Held on Nov. 3, 1992," 1992 Election Results for United States Senate, (July 6, 2004), *http:// www.sboe. state.nc.us/index _data.html* (showing Libertarian, Natural Law, and

---

10. A significant number of North Carolina voters have chosen not to align with the two major parties. In 2002, 833,392 voters were registered as unaffiliated. *See* "North Car-

olina County Statistics Report," Voter Registration Data Apr. 2002, (July 6, 2004), http:// *www.sboe. state.nc.us/* index _data.html.

Socialist 'Workers' party candidates for United States Senate); "Abstract of Votes Cast in the General Election Held Nov. 5, 1996," 1996 Election Results for United States Senate, (July 6, 2004), http:// www.sboe. state.nc.us/index _data.html (showing Libertarian, Natural Law Party, and write-in candidates for United States Senate); "1998 Grand Totals & Candidate Addresses," 1998 General Election Results, (July 6, 2004), http://www.sboe. state.nc .us/98generl /totals.pdf (documenting Libertarian candidate for United States Senate); "Official Results Summary, General Election of the State of North Carolina, Nov. 7, 2000," 2000 General Election Results, (July 6, 2004), http:// www.sboe. state.nc.us/y2000 elect/stateresults. html (reflecting votes cast for Libertarian and Reform party candidates for governor and votes cast for two write-in candidates). In contrast, during the past twenty years, only one unaffiliated candidate has been placed on the ballot as a contender for statewide office.[11]

The court acknowledges that the qualitative differences between unaffiliated and party candidates may justify quantitative differences in their treatment. See footnote 25, infra; see also Storer, 415 U.S. at 745, 94 S.Ct. 1274. However, unaffiliated candidates' ballot access requirements should be "reasonable" and "similar in degree" to party candidates' requirements. Wood v. Meadows, 207 F.3d 708, 712 (4th Cir.2000). "Reasonable, nondiscriminatory restrictions" are those that "neither substantially disadvantage independents nor favor them." Id. The Fourth Circuit has recognized that because independent candidates are more responsive to emerging issues and less likely to wield long-term or widespread governmental control, "as between new (third) party candidacies and independent candidacies, independent candidacies must be accorded even more protection than third party candidacies." Cromer v. South Carolina, 917 F.2d 819, 823 (4th Cir.1990).

Though Section 163–122(a)(1)'s signature requirement is not an unconstitutional burden per se, see Jenness, 403 U.S. at 442, 91 S.Ct. 1970, the requirement as applied in North Carolina severely disadvantages a candidate who chooses to run without a party affiliation rather than designate himself and his supporters a new party. Given the potential magnitude of the disparity and the historical evidence of ballot exclusion, the burden on unaffiliated candidates vis-a-vis new party candidates appears unreasonable and discriminatory. The variance in the State's ballot access requirements is sufficiently severe to warrant strict scrutiny. See McLaughlin, 65 F.3d at 1221 (analyzing ballot access restrictions for minor parties under strict scrutiny because their political participation was "extremely difficult" and burden on candidates was "undoubtedly severe"). Accordingly, North Carolina General Statute § 163–122(a)(1) may be upheld as a legitimate restriction on ballot access only if it is narrowly drawn to ad-

11. In 1992, Texas billionaire Ross Perot mounted an extensive campaign for president of the United States. He was listed on the ballot in North Carolina as an unaffiliated candidate. See Table, "Presidential General Election, Nov. 3, 1992," North Carolina Manual 1995–96 1091 (Lisa A. Marcus ed., 1996) (showing results for Democratic, Republican, and Libertarian candidates as well as for Perot as an unaffiliated candidate). Perot also ran for president in 1996 and appeared on the North Carolina general election ballot as the candidate for the Reform Party. See "Abstract of Votes Cast in the General Election Held on Nov. 5, 1996" 1996 Election Results for President, (July 6, 2004), http://www.sboe. state.nc.us/index _data.html. Perot's campaigns, with their widespread publicity and vast resources, stand in marked contrast to the "grass-roots," localized campaigns of many unaffiliated hopefuls such as DeLaney.

vance a compelling state interest. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059.

The Board offers two principal justifications for the disparity between the unaffiliated and new party petition requirements. First, the Board claims that imposing higher signature requirements on unaffiliated candidates will prevent ballot clutter. As evidence that the statute is fulfilling this purpose, the Board points to the fact that the ballots are not presently cluttered.

Eliminating ballot clutter is a valid state interest. *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) ("[T]he State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority."). However, North Carolina General Statute § 163–122(a)(1) is not the least restrictive means to prevent ballot clutter. The signature requirement for new parties, roughly 59,000 in 2002, is not a *de minimis* or insubstantial burden for any candidate. It has not produced an explosion of new parties, and there is no evidence that it would result in an unmanageable increase in candidates for public office if applied to unaffiliated candidates. The Board's simplistic argument that Section 163–122(a)(1) prevents ballot clutter through the *de facto* preclusion of unaffiliated candidates is misguided.

The Board's second rationale for the disparity concerns voter confusion. The Board posits that because unaffiliated candidates' beliefs are not widely known and cannot be determined from a name on the ballot, these candidates should show more support than new party candidates to obtain ballot access.[12] The Board reasons that voters can glean important information about a candidate simply by knowing his party affiliation.

Political parties, especially major parties whose platforms are widely disseminated, may "represent dependable philosophies, [enabling] voters to make more consistent and rational choices." *Cromer,* 917 F.2d at 833 (Wilkinson, J., dissenting). *See also Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 220, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) ("To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise."). However, this is not always the case, especially for new parties or small party organizations. For instance, a voter obtains no helpful information in the voting booth from a party named the "Freedom Party" or the "Paul DeLaney Party."[13] Likewise, even if a voter vaguely associates the "Green" party with environmental advocacy or the "Reform" party with governmental change, the party name often gives little indication of a candidate's stance on key issues of specific concern to that voter.

Moreover, Section 163–122(a)(1) does not effectively advance a state interest in

---

**12.** In her testimony, McLean explains that "[w]hen a third party is circulating petitions, their philosophies, their beliefs, their positions are widely known and can be associated with any candidate who might be nominated by that party to appear on the ballot. However, when an unaffiliated candidate qualifies by petition that indicates that the candidate is not the nominee of any recognized party, therefore it is not readily apparent about that

candidate's philosophies." McLean Testimony, Mar. 31, 2004.

**13.** The Board admits that under the current statutory scheme, DeLaney could circumvent the requirements for an unaffiliated candidacy by forming a new party. If he did so, it is unlikely that DeLaney's beliefs would be more well known than the beliefs of other unaffiliated candidates merely by virtue of his party status.

dissemination of a candidate's beliefs, however legitimate that interest may be. Though the two percent petition requirement may cause a tiny fraction of voters to ascertain an unaffiliated candidate's beliefs, the requirement provides no benefit to a large majority of the electorate, who still may be confused by the candidate's unaffiliated status. If the State's goal is to ensure that a candidate has a modicum of support for his platform, the new party signature requirement is a less restrictive means of meeting that goal.

The Board also contends that if DeLaney found the unaffiliated candidacy requirements too harsh, he could obtain ballot access by forming his own party.[14] However, the Supreme Court has stated that "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer*, 415 U.S. at 745, 94 S.Ct. 1274. As a result, North Carolina has "no sufficient state interest in conditioning ballot position for an independent candidate on his forming a new political party as long as the State is free to assure itself that the candidate is a serious contender, truly independent, and with a satisfactory level of community support." *Id.* at 746, 94 S.Ct. 1274.

Despite the Board's attempt to justify its restrictions, the court finds that the disparity between the requirements of Section 163–122(a)(1) and Section 163–96(a)(2) neither achieves nor advances any of the Board's stated interests. Therefore, the more restrictive requirements of Section 163–122(a)(1) cannot withstand strict scrutiny. *See Childrey v. Bennett*, 997 F.2d 830, 832 (11th Cir.1993) (stating that "the State conceded that such disparity of treatment between independent and minor party candidates was unconstitutional" in case where Alabama required an independent candidate's ballot petition to contain 26,000 signatures and a minor party candidate's petition to contain 12,158 signatures); *Anderson v. Morris*, 636 F.2d 55, 58–59 (4th Cir.1980) (affirming district court ruling that Maryland's imposition of harsher filing deadline on independent candidates *vis-a-vis* major party candidates was unconstitutional because it failed to achieve the State's objectives); *Greaves v. State Bd. of Elections of North Carolina*, 508 F.Supp. 78, 82 (E.D.N.C.1980) (striking previous version of North Carolina General Statute § 163–122 in part because it "grossly discriminates against those who choose to pursue their candidacies as independents rather than by forming a new political party" without a rational basis); *Baird v. Davoren*, 346 F.Supp.

---

**14.** The Board argues that North Carolina's ballot access requirements are constitutional because the State offers alternative routes to the ballot, citing *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) as authority. In *Jenness*, the Supreme Court found that Georgia's ballot access scheme did not violate the Fourteenth Amendment in part because alternative paths to the ballot were available. *Jenness*, 403 U.S. at 440–41, 91 S.Ct. 1970. However, the two available paths were either to run as a candidate of a "political party" (an organization that polled at least 20% of the vote in the last gubernatorial or presidential election), or to fulfill a petition requirement, which was identical for new party and independent candidates. *Jenness*, 403 U.S. at 433, 91 S.Ct. 1970. The *Jenness* court found that neither the burdens imposed on political parties nor those imposed on minor party/independent candidates were "inherently more burdensome than the other" because the party candidates had to enter and win the party primary while the non-recognized party and independent candidates had to fulfill a substantial signature requirement. *Id.* at 441, 91 S.Ct. 1970. In contrast, North Carolina's statutory scheme does not treat third party and unaffiliated candidates identically, but places a substantially greater burden on unaffiliated candidates.

515, 521 (D.Mass.1972) (concluding that election provisions "which grant special treatment to minor parties" were unconstitutional); *Danciu v. Glisson*, 302 So.2d 131, 133 (Fla.1974) (reducing five percent

signature requirement for independent candidates to three percent as required for minor party candidates because there was "no reasonable classification or valid basis" for the disparity).[15]

**15.** In some ballot access cases, courts have upheld disparities between signature requirements for unaffiliated and new party candidates. *See, e. g., Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 258 (6th Cir.1998) (affirming district court's finding that disparity between 1,807 signature requirement for unaffiliated candidates and 50 signature requirement for party candidates in primary election was constitutional); *Kuntz v. New York State Senate*, 113 F.3d 326, 328 (2d Cir. 1997) (upholding disparity between 3,500 signatures needed for independent candidate ballot access and 625 signatures needed for party candidate); *Salera v. Tucker*, 399 F.Supp. 1258, 1266 (E.D.Pa.1975) (rejecting challenge to difference between 35,000 signature requirement for independent candidates and 1,000 signature requirement for minor parties).

A common rationale for upholding the disparity is that unaffiliated and minor party candidates are not similarly situated. For example, in *Miller* and *Salera*, the party candidates' petitions placed them on the primary ballot, whereas the independent candidates' petitions placed them on the general election ballot. *See Miller*, 141 F.3d at 258–59 (finding that comparing independent and minor party candidates "is comparing apples to oranges" because one is a candidate for general election, and the other is merely a candidate for a primary election, so "the route open to an independent candidate ... is [not] more burdensome than that open to a party candidate"); *Salera*, 399 F.Supp. at 1266 ("[The] distinction does not appear unreasonable since obtaining the necessary valid signatures will assure an independent candidate a place on the final ballot, while meeting the nomination petition requirement will only assure a party candidate a place on the primary ballot, one step removed from the final ballot."). This difference between political parties and unaffiliated candidates is further heightened in cases such as *Kuntz*, where a distinction is drawn between established political parties and other types of candidacies. In *Kuntz*, a "party" was recognized only if it had won at least 50,000 votes in the previous election for governor. *See Kuntz*, 113 F.3d at 328 (rejecting independent candidate's ballot access

challenge because party already had made a showing of substantial support sufficient to justify a reduced signature requirement). *See also Jenness v. Fortson*, 403 U.S. 431, 441, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (concluding that major party candidates' burdens can differ from those imposed on minor and unaffiliated candidates for purposes of establishing ballot access requirements because "there are obvious differences ... between the needs and potentials of a political party with historically established broad support ... and a new or small political organization"); *Anderson v. Mills*, 664 F.2d 600, 607 (6th Cir.1981) (drawing distinction between "established well-financed parties/candidates, and those candidates and parties who have no elaborate political network" in ruling on ballot access challenge); *Cross v. Fong Eu*, 430 F.Supp. 1036, 1041 (N.D.Cal.1977) (rejecting ballot access challenge based on disparity between signature requirements of independent and party candidates because parties must poll two percent of the vote at the previous election to be recognized and party candidates must win primary to be placed on the ballot). Still other cases apparently justify the disparity based on a party's organizational burdens and additional requirements not applicable to independents, such as offering a slate of candidates. *See, e. g., Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1380 (10th Cir.1982) (upholding disparity between minor party and independent requirements because "a political group becoming a recognized political party and offering to the electorate a slate of candidates is far different than one individual becoming an independent candidate to run for a particular office"); *Stevenson v. State Bd. of Elections*, 638 F.Supp. 547, 554 (N.D.Ill.1986) (upholding disparities in ballot access requirements between parties and independents because party candidates create an entire party platform, run with a slate of candidates, and "[have] responsibilities which extend beyond those contemplated by an independent").

While disparities in ballot access requirements may have been adequately justified in these cases, the court finds such justifications inapplicable to the present case. Under

### III. *Vagueness Challenge*

In addition to challenging the heightened signature requirements, DeLaney seeks to invalidate Section 163–122(a)(1) because it is unconstitutionally vague. A vague statute is not reasonably necessary to achieve the State's interest in regulating ballot access. *See Duke v. Connell,* 790 F.Supp. 50, 53–54 (D.R.I.1992). DeLaney's vagueness challenge centers on the provision of the statute which reads: "[petitions] must be signed by qualified voters of the State equal in number to two percent (2%) of the total number of registered voters in the State as reflected by the most recent statistical report issued by the State Board of Elections." N.C. Gen.Stat. § 163–122(a)(1). Specifically, DeLaney takes issue with the basis for the signature requirement, reasoning that candidates do not know what constitutes the Board's "most recent statistical report" in determining the number of signatures they need.

In her testimony, McLean outlined the Board's administration of Section 163–122(a)(1). McLean explained that before data was stored electronically, the Board issued only two statistical reports each year. The first report compiled a statewide total of registered voters after the "close-of-books," or the last registration day for voters who wished to participate in the primary election. The second report compiled the total number of voters after the close-of-books deadline for the general election. These reports were considered "the most recent statistical reports" for purposes of Section 163–122(a)(1).

With the advent of the National Voter Registration Act, the Board began issuing quarterly reports in addition to the close-of-books reports. The Board considered these quarterly reports official statistical reports. If a potential unaffiliated candidate inquired about the number of signatures he needed under Section 163–122, the Board would use either the figures from the quarterly report or the figures from the close-of-books report, whichever the Board determined was "most recent" at the time of the inquiry. If no candidate contacted the Board, the Board would validate petitions using the close-of-books report closest in time to the June filing deadline.[16]

Recently North Carolina has instituted a statewide, electronic voter registration database. *See* N.C. Gen.Stat. § 163–82.11 (establishing a statewide computerized voter registration system). Nearly every county in the State has implemented computer software that sends the Board a current record of the county's registered voters.[17] Along with a listing of pertinent

North Carolina law, a political party does not need to show that its candidate previously has won voter support. Instead, a party is recognized and entitled to place candidates on the ballot once it fulfills the petition requirements of Section 163–96. *See* N.C. Gen.Stat. § 163–98. New parties do not participate in a primary election but hold nominating conventions to choose their candidates. *See id.* If the party has only one candidate, that candidate is placed on the general election ballot as the party representative. *See* N.C. Gen.Stat. § 163–110. In addition, North Carolina does not mandate that a new party offer a comprehensive slate of candidates or fulfill additional burdens that justify the benefits of easier ballot access. McLean testified that once a party

is recognized under Section 163–96, the party must "just meet and certify nominees" to place its candidates on the ballot. McLean Testimony, Mar. 31, 2004. Thus, unlike the candidates in the cases cited above, new party and unaffiliated candidates in North Carolina are substantially similar but treated unequally.

16. Once the Board established its target number of petition signatures, it would use that number to validate or disqualify each petition it received.

17. The handful of counties that do not use this software send the Board a compact disk or e-mail containing weekly voter totals.

election statutes and general information, the voter registration totals are posted on the Board's website and updated weekly. *See* "Voter Registration Statistics," (July 6, 2004), *http://www.sboe. state.nc.us/index_ data.html.*

North Carolina law provides that "[t]he [computerized] system shall serve as the official voter registration list for the conduct of all elections in the State." N.C. Gen.Stat. § 163–82.11. McLean asserts that though these computerized tabulations are "official" statistical reports, they are not official for purposes of Section 163–122(a)(1). McLean maintains that the Board still determines the petition requirement using the most recent close-of-books or quarterly report available when the first candidate calls to inquire about the signature goal. However, McLean admits that in 2004, due to a delay in party primaries, the Board did not use the most recent quarterly or close-of-books report to validate petitions. Instead, it chose the figures tabulated for January 1, 2004, as the basis for the signature requirement.[18] Thus, the Board has used various compilations of election data as "the most recent statistical report" for purposes of Section 163–122(a)(1). DeLaney contends that because Section 163–122(a)(1) does not specify what election data qualifies as the "most recent statistical report," the statute is too vague to provide a workable standard.

The void-for-vagueness doctrine is applicable to laws regulating conduct protected by the First Amendment. *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A statute is unconstitutionally vague if persons of "common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), if it does not give "a person of ordinary intelligence fair notice" of conformity with the statute's requirements, *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954), or if it "encourages arbitrary and erratic" enforcement by public officials. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

All three potential problems are implicated in this case. The statute never defines a "statistical report" for purposes of the petition requirements. As a result, candidates are left to guess whether the "Latest Statistics" on the "Voter Registration Statistics" section of the Board's website fulfill the statutory requirements. *See* "Voter Registration Statistics," (July 6, 2004), *http://www.sboe. state.nc.us/index _data.html.* McLean concedes that candidates may believe the "most recent statistical report" is listed on the website,[19] but dismisses the potential for confusion by claiming that "[candidates] develop what they think is the interpretation of the statute and they normally will call our office for verification of their understanding of the statute."[20] *See* Testimony of Johnnie

---

**18.** According to McLean, the use of this "unofficial" report as the basis for the petition requirement "just seemed to make sense." Testimony of Johnnie McLean, *DeLaney v. Bartlett* Evidentiary Hearing, 1:02CV00741, Mar. 31, 2004 (hereinafter "McLean Testimony, Mar. 31, 2004").

**19.** McLean Testimony, Mar. 31, 2004 (Q: "A candidate could find out what the law is, then go to [the Board of Elections] website, and whatever the most recent statistical number would be, it would be reasonable for him to assume that that was what the signature re-

quirement was, is that right?" A: (McLean) "[A candidate] could assume that, yes.").

**20.** In contrast, a new party candidate need not "develop his own interpretation" of the applicable signature requirement. North Carolina General Statute § 163–96 makes clear that the new party petition must include signatures equal to two percent of the total number of voters for governor, a number that easily can be determined through a variety of extrinsic sources and that is finalized well in advance of the candidate's petition drive.

McLean, *DeLaney v. Bartlett* Evidentiary Hearing, 1:02CV00741, Mar. 31, 2004 (hereinafter "McLean Testimony, Mar. 31, 2004"). Though some candidates may in fact call the Board for clarification, others may believe that the website's "latest voter registration statistics" clearly fall within the statutory provisions. Because the statute fails to define a "statistical report" and select a time frame to determine the "most recent" report, candidates' interpretations of the petition requirement may vary greatly.

Correspondingly, candidates cannot be sure from the text of the statute whether their petitions will qualify. This uncertainty has serious consequences for a candidate who relies on the Board's website. Because the website plainly displays the "most recent" voter registration numbers, a candidate viewing the website has no reason to know that the statistics are inapplicable to his petition drive. The website does not state that a candidate is required to call the Board for the petition requirement, and the Board's official petition requirement is not listed on the website after it has been determined. As a result, a candidate referencing the website could submit far more or far fewer signatures than the Board's requirement without knowing his efforts have been misdirected.[21]

The statute's vagueness also affects the Board's administrative obligations. Unlike the new party statute, in which the petition requirement is established shortly after the election for governor and remains unchanged for nearly four years, Section 163–122(a)(1) does not provide any guidance for determining when the "most recent" report should be issued. This ambiguity compels the Board to choose a report based not on a date certain but on the date a candidate first inquires about the requirement. For example, if a candidate asked about the signature requirement in December, the "most recent statistical report" available would be either the close-of-books report from the general election in November or the last quarterly report issued. Under the Board's current administration of the statute, two percent of one of these figures would be given to the inquiring candidate as the number necessary to validate his petition. However, if no candidates called to inquire about the target number but some candidates submitted petitions in June, the Board would validate the petitions based on the quarterly report ending in March, which would be the "most recent report" at that time. The statute's vagueness renders the signature requirement dependent on an arbitrary factor, and candidates have no way of knowing that the numbers are determined in this manner.

Finally, the statute's ambiguity gives rise to the potential for discriminatory enforcement. In her testimony, McLean emphasized that once the Board has chosen a target number for unaffiliated candidates to meet, all petitions are judged against that number, whether or not any candidates contact the Board. Consequently, the Board could deny ballot access to a conscientious candidate who mistakenly believed a lower voter registration total applied because he used the website fig-

---

21. A candidate who calls the Board may be working toward a drastically different number than a candidate who views the website's "latest statistics" in August or a candidate who views the website's "latest statistics" in December. Voter registration statistics can jump significantly in a matter of days, much less months. For example, on August 15, 2002, the Board's website reported that the total number of registered voters was 4,993,-368, which would require an unaffiliated candidate to submit 99,867 petition signatures. On August 25, 2002, the number of registered voters rose to 5,001,413, which would require a candidate to obtain 100,028 signatures. (Br. Supp. Pls.' Mot. Summ. J., at 13.)

ures. This is a harsh result given the confusion the website generates and the candidate's substantial compliance with the statutory requirements. However, if the Board made an exception for this candidate, the Board essentially would allow similarly situated candidates to bear unequal burdens for ballot access. The Board, a partisan entity,[22] would have no statutory authority to justify this exception and no standards to ensure a neutral determination of substantial compliance is made. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."); *Kay v. Mills*, 490 F.Supp. 844, 852 (E.D.Ky.1980) (noting that partisan nature of board of elections may affect neutrality in determining which candidates are placed on ballot). In short, the candidates and the Board both face challenges in determining compliance with the statute's provisions.

Nevertheless, in reviewing Section 163–122(a)(1) for vagueness, the court is mindful that " 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' " *I.N.S. v. St. Cyr*, 533 U.S. 289, 300 n. 12, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)). A plain reading of Section 163–122(a)(1) leads to the conclusion that the "most recent statistical report" is the report closest in time to the June filing deadline, regardless of whether a candidate contacts the Board. *See* N.C. Gen.Stat. § 163–122(a)(1). Yet construing the statute in this manner implicates fair notice concerns and requires guesswork by candidates, whose signature goal would be uncertain until shortly before the filing deadline. In addition, a clear definition of "statistical report" is not readily ascertainable. The close-of-books, quarterly, and website reports all may qualify as "statistical reports," and the Board has used each to fulfill the statutory requirements. The court cannot determine which "report" is the most appropriate without impermissibly encroaching on legislative domain.[23] *See Am. Party v. Jernigan*, 424 F.Supp. 943, 949 (E.D.Ark.1977) (acknowledging that establishing a petition deadline "would improperly involve the Court in exercising legislative prerogatives"). Because the court cannot construe Section 163–122(a)(1) to render it constitutionally valid, the statute must fail. *See Kay*, 490 F.Supp. at 850 (striking election statute that could not be narrowly construed to avoid vagueness).

## CONCLUSION

For the foregoing reasons, the court finds that North Carolina General Statute § 163–122(a)(1) is invalid. The statute's standards are unconstitutionally vague, and the law substantially disadvantages unaffiliated candidates without justification.

A judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

**22.** The Board is comprised of five members appointed by the governor. Three members traditionally are appointed from the governor's political party.

**23.** Because the Board's procedures for administering Section 163–122 are incongruent with the statutory language and create potential notice problems for candidates, such procedures are not entitled to deference.